JAMES CARVER, PLAINTIFF IN ERROR *vs.* JAMES JACKSON, ON THE DEMISE OF JOHN JACOB ASTOR, THEODOSIUS FOWLER; CADWALLADER D. COLDEN, CORNELIUS J. BOGET, HENRY GAGE MORRIS, MARIA MORRIS, THOMAS HINKS AND JOHN HINKS, DEFENDANTS IN ERROR.

The practice of bringing the whole of the charge of the court delivered to the jury in the court below for review before this court, is unauthorised, and extremely inconvenient, both to the inferior and to the appellate court. With the charge of the court to the jury upon mere matters of fact, and with its commentaries upon the weight of evidence, this court has nothing to do. Observations of that nature are understood to be addressed to the jury, merely for their consideration as the ultimate judges of the matters of fact; and are entitled to no more weight or importance than the jury in the exercise of their own judgment choose to give them. They neither are, nor are understood to be, binding on them, as the true and conclusive exposition of the evidence. If, in summing up the evidence to the jury, the court should mistate the law, that would justly furnish a ground for an exception. But the exception should be strictly confined to that mistatement; and by being made known at the moment, would often enable the court to correct an erroneous expression, so as to explain or qualify it in such manner as to make it wholly unexceptionable, or perfectly distinct. [SO]

The plaintiff claimed title under a marriage settlement purporting to be executed

Vol. IV.—A

the 13th of January 1758, by an indenture of release between Mary Philipse, of the first part, Roger Morris, of the second part, and Joanna Philipse and Beverly Robinson, of the third part. Whereby, in consideration of a marriage intended to be solemnized between Roger Morris and Mary Philipse, &c. R. M. and M. P. granted, &c. to J. P. and B. R. " in their actual possession now being, by virtue of a bargain and sale to them thereof made for one whole year, by indenture bearing date the day next before the date of these presents, and by force of the statute for transferring uses into possessions, and to their heirs, all those," &c. upon certain trusts therein mentioned. This indenture, signed and sealed by the parties, and attested by the subscribing witnesses to the sealing and delivery thereof, with a certificate of William Livingston, one of the witnesses, and the execution thereof before a judge of the supreme court of the state of New York, dated the 5th of April 1787, and of the recording thereof in the secretary's office of New York, was offered in evidence by the plaintiff, and objected to, on the ground that the certificate of the execution was not legal and competent evidence, and did not entitle the plaintiff to read the deed without proof of its execution. A witness was sworn, who proved the hand writing of William Livingston, and of the other subscribing witness, both of whom were dead. The certificate of the judge of the supreme court of New York stated, that William Livingston had sworn before him, that he saw the parties to the deed, " sign and seal the indenture, *and deliver it as th r and each of their voluntary acts and deeds,*" &c. *By the Court.* According to the laws of New York, there was sufficient prima facie evidence of the due execution of the indenture ; not merely of the signing and sealing, but of the delivery, to justify the court in admitting the deed to be read to the jury ; and that in the absence of all controlling evidence, the jury would have been bound to find that the deed was duly executed. [82]

The plaintiff, in the ejectment, derived title under the deed of marriage settlement of the 15th of January 1758, executed by Mary Philipse, who afterwards intermarried with Roger Morris, and by Roger Morris and certain trustees named in the same. The premises, before the execution of the deed of marriage settlement, were the property of Mary Philipse, in fee simple. The defendant claimed title to the same premises under a sale made thereof, as the property of Roger Morris and wife, by certain commissioners acting under the authority of an act of the legislature of New York, passed the 22d of October 1779, by which the premises were directed to be sold, as the property of Roger Morris and wife, as forfeited ; Roger Morris and wife having been declared to be convicted and attainted of adhering to the enemies of the United States. Not only is the recital of the lease in the deed of marriage settlement evidence between the original parties to the same, of the existence of the lease ; but between the parties to this case, the recital is conclusive evidence of the same, and superseded the necessity of introducing any other evidence to establish it. [83]

The recital of the lease in the deed of release in the present case, was conclusive evidence upon all persons claiming under the parties in privity of estate, as those in this case claim. And, independently of authority, the court would have arrived at the same conclusion upon principle. [88]

As to the law of estoppels. [83]

Leases like other deeds and grants may be presumed from long possession, which cannot otherwise be explained ; and under such circumstances, a recital in an old deed, of the fact of such a lease having been executed, is certainly pre-

[Carver *vs.* Jackson ex dem. Astor et al.]

sumptive proof or stronger in favour of such possession under title, than the naked presumption arising from a mere unexplained possession. [84]

The uses declared in a deed of marriage settlement were ; to and for the use of "Joanna Philipse and Beverly Robinson, (the releasees), and their heirs, until the solemnization of the said intended marriage ; and from and, immediately after the solemnization of the said intended marriage, then to the use and behoof of the said Mary Philipse and Roger Morris, and the survivor of them, for and during the time of their natural lives, without impeachment of waste ; and from and after the determination of that estate, *then to the use and behoof of such child or children, as shall or may be procreated between them, and to his, her or their heirs and assigns for ever.* But in case the said Roger Morris and Mary Philipse shall have no child or children begotten between them, or that such child or children shall happen to die during the life time of the said Roger and Mary, and the said Mary should survive the said Roger, *without issue,* then to the use and behoof of her, the said Mary Philipse, and her heirs and assigns forever. And in case the said Roger should survive the said Mary Philipse, *without any issue by her, or that such issue is then dead, without leaving issue,* then after the decease of the said Roger Morris, to the only use and behoof of such person or persons, and in such manner and form as the said Mary Philipse shall, at any time during the said intended marriage, desire the same by her last will and testament, &c. &c. The marriage took effect, children were born ; all before the attainder of their parents in 1779. Mary Morris survived her husband, and died in 1825, leaving her children surviving her. This is a clear remainder in fee to the children of Roger Morris and wife ; which ceased to be contingent on the birth of the first child, and opened to let in after born children. [90]

It is perfectly consistent with this limitation, that the estate in fee might be defeasible, and determinable upon a subsequent contingency ; and upon the happening of such contingency, might pass by way of shifting executory use to other persons in fee, thus making a fee upon a fee. [90]

The general rule of law founded on public policy is, that limitations of this nature shall be construed to be vested when, and as soon as they may vest. The present limitation in its terms purports to be contingent only until the birth of a child, and may then vest. The estate of the children was contingent only until their birth, and when the confiscation act of New York passed, they being all born, it was a vested remainder in them and their heirs, and not liable to be defeated by any transfer or destruction of the life estate. [92]

The act of the legislature of New York of May 1, 1786, gave to the purchasers of forfeited estates the like remedy in case of eviction, for obtaining compensation for the value of their improvements, as is directed in the act of the 12th of May 1784. The latter act declares, that the person or persons having obtained judgment against such purchasers, shall not have any writ of possession, nor obtain possession of such lands, &c. until he shall have paid to the purchaser of such lands, or person holding title under him, the value of all improvements made thereon, after the passing of the act. Held, that claims of compensation for improvements made under the authority of these acts of the legislature of New York, are inconsistent with the provisions of the treaty of peace with Great Britain, of 1783, and should be rejected. [101]

That in all cases a party is bound by natural justice to pay for improvements on land, made against his will, or without his consent, is a proposition which the court are not prepared to admit. [101]

THIS was a writ of error to the circuit court of the United States, for the southern district of New York.

In the circuit court for the southern district of New York, an action of ejectment was instituted by the defendant in error, for the recovery of a tract of land in the town of Carmel, in the county of Putnam, in the state of New York. The plaintiff claimed title on the demise of John Jacob Astor and others, named in the case. The action was tried by a jury at October term 1829, in the circuit court, in the city of New York, and a verdict and judgment rendered for the plaintiff in the same ; a bill of exceptions was tendered by the defendant in the circuit court, who prosecuted this writ of error.'

After judgment was rendered for the plaintiff in the circuit court, he prayed the court to order a writ of possession, to cause him to have possession of the premises ; and thereupon James Carver suggested to the court, that Roger Morris, and Mary Morris his wife, under whom the plaintiff in ejectment claimed, were for fifteen years and upwards, next before the 22d of October 1779, in possession of a large tract of land in the then county of Dutchess, in the state of New York, including the premises. That on the 22d of October 1779, the legislature of the state of New York, by " an act for the forfeiture and sale of the estate of persons who have adhered to the enemies of the state, &c." declared Roger Morris and his wife to be convicted and attainted of adhering to the enemy ; and all their estate, real and personal, severally and respectively, in possession, reversion, or remainder, was forfeited and vested in the people of the state. That commissioners appointed under this act, on the 16th of November 1782, sold, disposed of, and conveyed the land in question in this suit, to Timothy Carver, his heirs and assigns, for the consideration of seventy-one pounds. That by an act of the legislature of the 12th of May 1784, and an act of the 1st of May 1786, it was among other things provided, that where judgment in a due course of law should be obtained for any lands sold by the commissioners of forfeitures, against any person who derived title thereto under the people of the state, or the commissioners,

the person who obtained judgment should not have a writ of possession, or obtain possession of the land, until he or she should have paid to the person in possession under said title, the value of all improvements made thereon, to be estimated as provided in the acts. That he, the said Timothy Carver, purchased the property held by him in the full confidence that he obtained a perfect indefeasible title to the land in fee simple, entered forthwith into possession of the same, made great, valuable and permanent improvements on the land, which are now in value upwards of two thousand dollars, by which the lands are enhanced in value to that sum and upwards. That Timothy Carver afterwards conveyed the premises to James Carver, the defendant in ejectment, who also made other valuable improvements on the land, before the commencement of this suit, of the value of two thousand dollars and upwards. That this action has been commenced and prosecuted, and a recovery has been had on a ground of title, reciting the same ; that the act of the legislature of New York, passed the 22d of October 1779, for the forfeiture of estates, &c. did not take from the plaintiff in the suit the title to the premises, after the death of Roger Morris and wife, both of whom were deceased at the time of the institution of this suit. So that the plaintiffs were the owners of the land in fee, and entitled to recover the possession of the same. And the defendant insists that, under the provisions of the several acts of the legislature of New York, he ought to be paid the value of the improvements made on the lands ; that no writ of possession should issue until the same was paid ; and he prays the court to stay the plaintiff from the writ, or from having possession of the lands, until the value shall be paid ; and that commissioners may be appointed to ascertain the said value.

The plaintiff did not deny the facts alleged by the defendant, but he denied the right of the defendant to be paid for the improvements, and insisted on his right at law to a writ of possession, and to the possession of the land without paying the value of the improvements. The court held, that the matters suggested by the defendant, and admitted by the plaintiff, were not sufficient to bar or stay the plaintiff from

having his writ of possession, or possession of the land without paying the whole or any part of the value of the improvements estimated or valued in any way whatever ; and that the plaintiff should have a writ of possession to cause him to have possession of the lands.

The bill of exceptions set forth the whole proceedings on the trial of the cause ; and that an agreement had been entered into by the parties to it, that the plaintiff is not entitled to the recovery of the property unless it should satisfactorily appear in the suit, in addition to whatever else may be necessary to authorise a recovery therein, that the whole title, both in law or equity, which may or can have been vested in the children and heirs of Roger Morris and Mary his wife, of, in or to the premises or lands in question in the suit, has been, as between the grantors and grantees, legally transferred to John Jacob Astor, one of the lessors of the plaintiff, his heirs and assigns ; nor unless a proper deed of conveyance in fee simple from John Jacob Astor and all persons claiming under him to the people of the state of New York, would be valid and effectual to release, transfer, and extinguish all the right, title, and interest, which now is, or may have been vested in the children and heirs of Roger Morris and wife.

The plaintiff in the ejectment gave in evidence a patent from William III. to Adolphe Philipse, dated 17th June 1692, for a large tract of land, including the premises, and proved the descent of the same to Frederick Philipse ; and that Mary Philipse, who afterwards intermarried with Roger Morris, was a devisee in tail with other children of Frederick Philipse, and by subsequent proceedings in partition, and by a common recovery, Mary Philipse became seised in fee simple of one equal undivided part of the land granted by the patent; and that afterwards, on the 7th of February 1754, a deed of partition, reciting the patent and the title of the heirs, was executed between the children and devisees and heirs of Frederick Philipse, by which the portions severally belonging to them were set apart and divided to each in severalty, one portion being allotted to Mary Philipse ; the land in controversy being included in the land surveyed

[Carver *vs.* Jackson ex dem. Astor et al.]

and held under the patent and deed of partition. The part allotted to Mary Philipse in the partition, was No. 5.

The plaintiff then offered to read in evidence a deed of marriage settlement, dated 13th of January 1758, intended to convey all the land in No. 5, between Mary Philipse, of the first part, Roger Morris of the second part, Joanna Philipse and Beverly Robinson of the third part; on the back of which deed was indorsed a certificate in the following terms: " Be it remembered that on the 1st day of April 1787, personally came and appeared before me; John Sloss Hobart, one of the justices of the supreme court of the state of New York, William Livingston, Esq., governor of the state of New Jersey, one of the subscribing witnesses to the within written indenture, who being by me duly sworn, did testify and declare that he was present at or about the day of the date of the within indenture, and did see the within named Joanna Philipse, Beverly Robinson, Roger Morris, and Mary Philipse, sign and seal the same indenture, and deliver it as their and each of their voluntary acts and deeds, for the uses and purposes therein mentioned, and I having carefully inspected the same, and finding no material erasures or interlineations therein, other than those noted to have been made before the execution thereof, do allow the same to be recorded. John Sloss Hobart." Upon the back of the deed was also indorsed a certificate of the recording thereof, in the following words: " Recorded in the secretary's office of the state of New York, in deed book commencing 25th November 1774, page 550. Examined by me this 11th of April 1787. Robert Harpur, D. Secretary." To which said evidence, so offered, the counsel for the defendant objected; upon the ground that the certificate was not legal and competent evidence to be given to the jury, and did not entitle the plaintiff to read the deed in evidence, without proof of its execution; and that the certificate was not sufficient, inasmuch as it did not state that William Livingston testified or swore that he was a subscribing witness to the deed. The parts of the deed of 13th January 1758 material to the case, are the following:

This indenture, made the 13th day of January, in the thir-

ty-first year of the reign of our sovereign lord, George II.
by the grace of God, of Great Britain, France, and Ireland,
king, defender of the faith, &c., and in the year of our Lord
1758, between Mary Philipse of the first part, major Roger
Morris of the second part, and Joanna Philipse and Beverly
Robinson of the third part, witnesseth, that in consideration
of a marriage intended to be had and solemnized between
the said Roger Morris and Mary Philipse, and the settlement
hereafter made by the said Roger Morris on the said Mary
Philipse, and for and in consideration of the sum of five shil-
lings, current money of the province of New York, by the
said Joanna Philipse and Beverly Robinson to her, the said
Mary Philipse, at or before the ensealing and delivery of
these presents, well and truly paid, the receipt whereof is
hereby acknowledged; and for divers other good causes and
considerations, her thereunto moving, she, the said Mary
Philipse, hath granted, bargained, sold, released and con-
firmed, and by these presents doth grant, bargain, sell, re-
lease and confirm, unto the said Joanna Philipse and Beverly
Robinson, (in their actual possession now being, by virtue
of a bargain and sale to them thereof made, for one whole
year, by indenture bearing date the day next before the day
of the date of these presents, and by force of the statute for
transferring of uses into possession), and to their heirs, all
those several lots or parcels of land, &c." describing the
property, in which is included the land in controversy in this
suit.

"To have and to hold all and singular the several lots of
land, &c., and all and singular other the lands, tenements,
hereditaments, and real estate, whatsoever of her the said
Mary Philipse, &c., unto the said Joanna Philipse and Bever-
ly Robinson, and their heirs, to and for the several uses, in-
tents, and purposes, hereinafter declared, expressed, limit-
ed and appointed, and to and for no other use, intent, and
purpose whatsoever; that it to say, to and for the use and
behoof of them the said Joanna Philipse and Beverly Robin-
son, and their heirs, until the solemnization of the intended
marriage, and to the use and behoof of the said Mary Phil-
ipse and Roger Morris, and the survivor of them, for and dur-

ing the term of their natural lives, without impeachment of waste, and from and after the determination of that estate, then to the use and behoof of such child or children as shall or may be procreated between them, and to his, her, or their heirs and assigns for ever; but in case the said Roger Morris and Mary Philipse shall have no child or children begotten between them, or that such child or children shall happen to die, during the life time of the said Roger and Mary, and the said Mary should survive the said Roger, without issue, then to the use and behoof of her, the said Mary Philipse, and her heirs and assigns for ever; and in case the said Roger Morris should survive the said Mary Philipse, without any issue by her, or that such issue is then dead without leaving issue, then, after the decease of the said Roger Morris, to the only use and behoof of such person or persons, and in such manner and form, as she, the said Mary Philipse, shall, at any time during the said intended marriage, devise the same by her last will and testament; which last will and testament, for that purpose, it is hereby agreed by all the parties to these presents, that it shall be lawful for her, at any time during the said marriage, to make, publish and declare, the said marriage, or any thing herein contained, to the contrary thereof in any wise notwithstanding; provided, nevertheless, and it is the true intent and meaning of the parties to these presents, that it shall and may be lawful, to and for the said Roger Morris and Mary Philipse, jointly, at any time or times during the said marriage, to sell and dispose of any part of the said several lots or parcels of land, or of any other her lands, tenements, hereditaments and real estate whatsoever, to the value of three thousand pounds, current money of the province of New York; and in case the said sum of three thousand pounds be not raised by such sale or sales during their joint lives, and they have issue between them, that then it shall be lawful for the survivor of them to raise the said sum, by the sale of any part of the said lands, or such deficiency thereof as shall not then have been already raised thereout, so as to make up the said full sum of three thousand pounds, any thing hereinbefore contained to the contrary thereof in any wise notwithstanding.

The court overruled the objection, and allowed the deed to be read in evidence, and the counsel for the defendant excepted to the same.

Evidence was then given, by the testimony of Mr Hoffman, to prove the death of William Livingston and Sarah Williams, who were witnesses to the deed, and that the names of those persons were their proper hand writing. That Mary Philipse and Roger Morris intermarried, and had four children, all born before October 1779; also the death of some of the children; the intermarriage of others; that Joanna Philipse was the mother of Mary Morris and Susanna Robinson, wife of Beverly Robinson; that Beverly Robinson died between 1790 and 1795; that Roger Morris died in 1794, and his wife Mary Morris died in 1825. Evidence was also given to show that Roger Morris was in possession of the premises from 1771 to 1774.

The plaintiff then gave in evidence a conveyance by lease and release of the premises, inter alia, by the heirs and legal representatives of Roger Morris and wife to John Jacob Astor.

The conveyance by the commissioners of forfeited estates to Timothy Carver, of the land, was then given in evidence by the plaintiffs, and by Timothy Carver and wife to the defendant.

Mr Barclay proved that Roger Morris and his family left this country for England just before the evacuation of the city of New York by the British troops in 1782 or 1783, and that neither of them had since returned to the United States.

The plaintiff here rested his case.

And thereupon the counsel of the defendant objected and insisted, that (independent of any other questions that might arise upon the plaintiff's case) unless the deed, commonly called a marriage settlement deed, which had been given in evidence, was accompanied or preceded by a lease, the plaintiff could not recover in this action : that without such lease, the deed could only operate as a deed of bargain and sale, and the statute of uses would only execute the first use to the bargainees, Joanna Philipse and Beverly Robinson, who took the legal estate in the land ; and that the children of

the said Roger Morris and his wife took only trust or equitable interests, and not the legal estate in the lands; and that the plaintiff could not recover, because such lease had not been produced, nor its absence accounted for, if one existed; and of this opinion was the court.

The counsel for the plaintiff then offered to give evidence to the court, to prove the loss of the said lease, to lay the foundation for secondary evidence of its contents, by showing that diligent search for such lease had been made in various places, without being able to find the same; to which evidence the counsel for the defendant objected, on the ground that such evidence did not go to prove the loss or destruction of the lease, but to show that none ever existed; and that before the plaintiff could give such, or any other evidence of the loss of the lease, he must prove that a lease did once exist.

The counsel for the plaintiff then offered to give evidence to show that diligent efforts had been made in England and in the United States to find the lease, without success; which was objected to by the defendant, on the ground that such evidence did not go to prove the loss or destruction of the lease, but to show that none ever existed; and that before such evidence was given, it must be proved that a lease did once exist. The court overruled this objection, considering the recital in the release prima facie evidence for that purpose, and the plaintiff gave the evidence. To this decision, in overruling the objections and admitting the evidence; the counsel for the defendant excepted.

Testimony was then offered and admitted to prove that it was the almost universal practice not to record the lease, when the conveyance was by way of lease and release. This evidence was given by the testimony of persons who had examined the offices of record, and not by that of those who kept the records. The counsel for the defendant objected to this evidence, alleging that the facts asserted could only be proved by the persons who had the custody of the records; but this objection was overruled, and the same was excepted to.

Here the plaintiff again rested the proofs as to the loss of

the lease; and offered to give secondary evidence to the jury of its previous existence and contents. The counsel for the defendant objected, and insisted that the plaintiff had not sufficiently proved the loss of the lease, and was not entitled to go into secondary evidence of its previous existence and contents.

But the court overruled the objections; and was of opinion that the plaintiff had, from the evidence, satisfied the court as to the loss and non-production of the lease, and was entitled to give secondary evidence of its contents; to which opinion and decision, the counsel for the defendant also excepted.

The counsel for the plaintiff, for the purpose of proving to the jury the existence and contents of the lease, offered to read in evidence to the court and jury, the recital contained in the said release or marriage settlement deed, of a lease or bargain and sale for a year; to which evidence so offered as aforesaid, the counsel for the defendant objected, on the ground that the said recital was not evidence for those purposes against the defendant.

But the court overruled the objections, and permitted the recital to be read in evidence to the jury, to prove the existence and contents of the lease; to which opinion and decision the counsel for the defendant also excepted.

The plaintiff then offered, and gave in evidence, by the testimony of Mr Benson and Mr Troup, that William Livingston, who had witnessed the deed of release, was an eminent lawyer in the city of New York, where the deed was executed, and that it was the practice at that time to employ lawyers to draw deeds; that it was usual to recite the lease in the deed of release; that it was a frequent practice in New York to convey lands by lease and release, until within four years of the revolution. Evidence was also offered and admitted by the books of record to show what was the usual form and contents of a lease. To all this testimony the counsel for the defendant excepted.

The printed journal of the house of assembly of New York, for the year 1787, was then admitted in evidence, under an exception by the counsel for the defendant. It

[Carver vs. Jackson ex dem. Astor et al.]

showed that on the 16th of February 1787 a petition had been presented by Joanna Morris on behalf of herself, her brothers and sisters, children of Roger Morris and Mary his wife, relative to the estate forfeited to the people of the state of New York by the attainder of their parents, and a report thereon to the legislature, and here the plaintiff rested his case.

The defendant gave evidence to prove that Timothy Carver, and himself under him, had been in possession of the premises since the close of the revolutionary war, claiming the same in fee. He also produced and read in evidence, conveyances by way of lease and release executed by Roger Morris and wife in 1765, 1771, 1773, and other deeds and leases for parts of the lot No. 5, in which no mention was made of the marriage settlement, and in which the property was described as held under the patent to Adolphe Philipse, and which Roger Morris and wife covenant "that they had good right and full power and lawful authority to release and convey the same in fee." The defendant also gave in evidence the exemplification of a patent to Beverly Robinson, Roger Morris and Philip Philipse, dated the 27th of March 1761, in which is recited the surrender of part of the great tract granted to Adolphe Philipse on the 17th of June 1696, the descent of the whole of the said tract to the children of Frederic Philipse; no mention being made in the recitals of the marriage settlement, and by which patent two tracts of land, as a compensation for part of the land held under the original patent, which was supposed to lie within the Connecticut line, was granted.

It was proved, by the evidence of Mr Watts, that he had in his possession the marriage settlement deed which had been read in evidence, at and immediately before the time of its proof before judge Hobart in 1787; that the witness wrote the body of the certificate of proof indorsed on the back; that the whole of the said certificate was written by the witness, except the name of judge Hobart, written at the bottom, which was written by the said judge; that he believes he wrote the certificate in the presence of the judge, at the time the proof was made, which was at the house of said judge, in the city of New York; governor Livingston

was then staying at judge Hobart's house on a visit. On being shown the said original certificate, the witness said that a blank was originally left in the body of the said certificate for the name of the judge or officer before whom the said proof was to be made, and from that circumstance he had no doubt that the said certificate was written before he knew what officer would take the said proof, and not in the presence of the judge ; that the witness received the said deed early in the said year 1787, in an enclosure from the said Roger Morris, who was then in London, England.

The plaintiff then gave in evidence, the defendant's excepting thereto, the act of the legislature of the state of New York, passed April 16th, 1827, entitled "an act to extinguish the claim of John Jacob Astor and others, and to quiet the possession of certain lands in the counties of Putnam and Dutchess;" the act passed April 19th, 1828, entitled "an act to revive and amend an act entitled 'an act to extinguish the claim of John Jacob Astor and others, and to quiet the possession of certain lands in the counties of Putnam and Dutchess.'" Evidence was also given, the defendant's counsel excepting thereto, to show that this suit was defended for the state of New York by the attorney general of the state.

The counsel for the defendant then gave in evidence an exemplification of the proceedings of the council of safety of New York, on the 16th of July, 1776, in which it was resolved unanimously, that all persons abiding within the state of New York, and deriving protection from the laws of the same, owe allegiance to the said laws, and are members of the state ; and that all persons passing through, visiting or making a temporary stay in the said state, being entitled to the protection of the laws during the time of such passage, visitation or temporary stay, owe, during the same time, allegiance thereto : that all persons, members of or owing allegiance to this state as before described, who shall levy war against the said state within the same, or be adherent to the king of Great Britain, or others the enemies of said state, and being thereof convicted, shall suffer the pains and penalties of death.

[Carver *vs.* Jackson ex dem. Astor et al.]

The counsel for the defendant also read in evidence an act of the legislature of the state of New York, entitled "an act for the forfeiture and sale of the estates of persons who have adhered to the enemies of this state, and for declaring the sovereignty of the people of this state, in respect to all property within the same," passed the 22d of October 1779; it being admitted by the counsel for both parties, that Roger Morris, Mary Morris, the wife of Roger Morris, and Beverly Robinson, mentioned in the first section of the act, are and were the same persons by those names therein before mentioned; Beverly Robinson being the person by that name who was one of the parties to the marriage settlement deed:

Also an act, entitled "an act for the speedy sale of the confiscated and forfeited estates within this state, and for other purposes therein mentioned," passed the 12th of May 1784:

Also, "an act further to amend an act entitled 'an act for the speedy sale of the confiscated and forfeited estates within this state, and for other purposes therein mentioned,'" passed the 1st of May 1786:

Also, "an act limiting the period of bringing claims and prosecutions against forfeited estates," passed the 28th of March 1797:

Also, "an act for the limitation of criminal prosecutions, and of actions and suits at law," passed the 26th of February 1788; and "an act for the limitation of criminal prosecutions, and of actions at law," passed the 8th of April 1801.

The counsel for the plaintiff then made and submitted to the court in writing, the following points upon which they relied:

1. Mary Philipse, in January 1758, was seised in fee simple.

2. By the deed of settlement a contingent remainder was limited to the children of that marriage, *which vested as soon as they were born,* and no act of Morris or his wife, done after the execution of that deed, can impair the estate of the children.

3. The recital of the' lease' in the release, is an estoppel against the defendant, as to the fact so recited on the ground of privity of estate.

4. If the recital be not a technical estoppel, then it is an admission of a fact in solemn form, by the parties to that deed, and is evidence of the fact recited, from which the jury are bound to believe the fact, unless it be disproved.

5. The attainder and sale under it operated as a valid conveyance of all the estate of the attainted persons at the date of the attainder, and no more. The purchasers under this state acquired a title in these lands for the lives of Morris and his wife, and of the survivor of them, and in judgment of law must be considered as standing in the same relation to the children of that marriage, as the orignal tenants for life, whose estates wer? confiscated.

6. As the purchasers under the state were tenants for life, and the children of Morris and his wife, or their assignees, are seised *in remainder of the fee,* it results from that relation that the possession of the purchasers could not be adverse to *the title of the remaindermen.* The persons entitled to the remainder have five years from the death of Mrs Morris to commence their suits for the land; and the sale by the remaindermen to Mr Astor, during the existence of the life estate, in accordance with the rules of the common law, and in violation of no statute.

7. The principles of natural law, as well as the treaties of the 3d of September 1783, and 19th of November 1794, between the United States and Great Britain, confirm and protect the estate so required by Mr Astor.

And the counsel for the defendant submitted in writing to the court the following points on which they relied:

1. That the plaintiff cannot recover in this action, unless a lease preceded or accompanied the release which has been read in the case.

2. That the plaintiff, not having offered any evidence of the actual execution or contents of any particular paper, as such lease, cannot recover on the ground that a lease was executed and is lost.

.3. That the testimony of Egbert Benson, Robert Troup, and the other witnesses, as to the custom or practice of conveying by lease and release; the professional character of William Livingston, and his connexion with the Philipse family; although it might, under certain circumstances, be evidence to lay the foundation for a general presumption, according to the rules of law respecting presumptions of deeds and grants, that a proper lease or other writing, necessary to support the conveyance, had been executed; is not competent to prove, either the actual execution, existence in fact, or contents of the alleged lost lease.

4. That no legal presumption of a deed or lease, such as is necessary to enable the plaintiff to support this action, can fairly arise in this case; because the facts and circumstances of the case are not such as could not, according to the ordinary course of affairs, occur without supposing such a deed or lease to have existed; but are perfectly consistent with the non-existence of such lease.

5. That no possession having been proved in this case, more consistent with the title of the plaintiff than with that of the defendant, any deed or lease, necessary to support the plaintiff's action, must be proved, and cannot be presumed.

.6. That the recitals in the deed of release do not bind the defendant by way of estoppel; because he is a stranger to the deed, and claims nothing under it.

7. That inasmuch as the defendant is not only a stranger to the deed of release, and claims nothing under it, but as also it appears that the defendant's immediate grantor entered into possession of the premises as early as the year 1783, under a claim of title adverse to that supposed to be created by the said deed or release, and he and the defendant, after and under him, have continued so in possession, under such adverse claim of title, to the present time; the recitals in said deed of release are not evidence against the defendant.

8. Supposing the lease and release to have been duly executed, then the remainder, limited to the children of Roger Morris and Mary his wife, was a contingent, and not a vest-

ed remainder, at the time of the attainder and banishment of Roger Morris and Mary his wife, in 1779.

9. By the attainder and banishment of Roger Morris and Mary his wife in 1779, they became civilly dead, and their estate in the lands determined, before the time when the contingent remainder to the children could vest; and thus the contingent remainder to the children was destroyed for the want of a particular estate to support it.

10. By the attainder and banishment of Beverly Robinson, the surviving trustee, in 1779, and the forfeiture of all his estate to the people of the state of New York, all seisin, possibility of entry, or scintilla juris in Beverly Robinson, to serve the contingent use when they arose was divested; and inasmuch as the estate cannot be seised to uses, there was no seisin out of which the uses in remainder could be served, when the contingency upon which they were to arise or vest happened; and the state took the estate discharged of all the subsequent limitations in remainder.

11. In consequence of the attainder and banishment of Beverly Robinson, the surviving trustee, and Roger Morris and Mary his wife, in 1779, and the forfeiture of all their, and each of their estate in the land to the people of the state of New York, the children of Roger Morris and Mary his wife never had any legal seisin in the land.

12. In consequence of the act of attainder, and the conveyance made by the people of the state of New York to Timothy Carver with warranty, the estate of the children of Roger Morris and Mary his wife, in the lands in question in this suit, was defeated and destroyed.

13. Roger Morris and Mary his wife, under the marriage settlement deed, had an interest in the land, and might convey in fee to the amount of three thousand pounds in value. They did convey to the amount of one thousand one hundred and ninety-five pounds in value, and the residue of that interest was forfeited to, and vested in the people of New York; and the power was well executed by the conveyance of the commissioners of forfeitures to Timothy Carver, the defendant's grantor.

14. The whole title, both in law and equity, which may

or can be vested in the children and heirs of Roger Morris and Mary his wife, of, in and to the lands and premises in question, has not been, as between the grantors and grantee, legally transferred to the said John Jacob Astor, his heirs and assigns.

15. A proper deed of conveyance in fee simple from the said John Jacob Astor, and all persons claiming under him, to the people of the state of New York, would not be valid and effectual to release, transfer, and extinguish all right, title and interest which now is, or may have been vested in the children and heirs of Roger Morris and Mary his wife.

16. The plaintiff's action is barred under the act limiting the period of bringing claims and prosecutions against forfeited estates.

17. The plaintiff's action is barred under the general limitation act of 1788, also under the general limitation act of 1801.

Upon which the court expressed the following opinion and instructions, to be given to the jury on the defendant's points; under the modifications stated in the same.

1. The court gave the instruction as prayed.

2. It having been satisfactorily proved to the court, that the lease was lost, its execution and contents may be proved by secondary evidence.

3. That the testimony of Egbert Benson, Robert Troup, and other witnesses, as to the custom and practice of conveying by lease or release; the professional character of William Livingston, and his connexion with the Philipse family, coupled with the recital in the release; were admissible in this case to go to the jury, for them to determine whether a proper lease, necessary to support the conveyance of release so as to pass the legal estate, had been executed.

4. That the jury might in this case presume, if the evidence satisfied them of the fact, that such lease was duly executed, if in their opinion the possession was held by Roger Morris and his wife, under this marriage settlement deed, embracing both the lease and release. And that it was for them to decide from the evidence, whether the poss-

ession was held under the marriage settlement or under the title of Mary Philipse, anterior to the marriage settlement.

5. The instruction on this point is embraced in the answer to the fourth.

6. That the recital in the release does not bind the defendant by way of estoppel; but is admissible evidence to the jury, connected with the other circumstances, for them to determine whether a proper lease was made and executed.

7. The instruction on this point is included in the answer to the sixth.

8. The remainder limited to the children of Roger Morris and Mary his wife, was a vested remainder at the time of the attainder and banishment of Roger Morris and Mary his wife, in the year 1779, and did not thereafter require any particular estate to support it; but if a particular estate was necessary, there was one sufficient in this case for that purpose.

9 and 10. The answer to these points is included in the answer to the eighth.

11. The attainder and banishment of Beverly Robinson, Roger Morris and Mary his wife, in the year 1779, and the forfeiture of all their estate in the land to the people of the state of New York, and the conveyance to Timothy Carver of the lands in question, did not take away the right which the children of Roger and Mary Morris had under the marriage settlement deed.

12. The answer to this point is included in the answer to the eleventh.

13. Admitting that the power reserved to Morris and his wife to sell a part of the lands included in the marriage settlement deed became forfeited to the state, so far as it had not been executed, the sale to Timothy Carver could not, under the evidence in this case, be considered an execution of that power.

14. The whole title, both in law and equity, which may or can have vested in the children and heirs of Roger Morris and Mary his wife, of, in or to the lands and premises in question, has been, as between the grantors and grantee,

legally transferred to John Jacob Astor, his heirs and assigns, according to the true intent and meaning of the acts of the legislature of the state of New York, which have been produced and read upon the trial.

15. A proper deed of conveyance, in fee simple, from John Jacob Astor, and all persons claiming under him, to the people of the state of New York, would be valid and effectual, to release, transfer and extinguish all right, title and interest which now is, or may have been vested in the children and heirs of said Roger Morris and Mary his wife, according to the true intent and meaning of the acts of the legislature referred to in the next preceding instruction.

16 and 17. The plaintiff's action is not barred by any statute of limitations in this state.

The court then charged the jury.

After stating the plaintiff's title under the patent to Adolphe Philipse in 1697, and that it was not denied by the defendant, but that Mary Philipse in 1754 became seised, in severalty, in fee simple of the premises in question, the court proceeded to say:

"At this point the dispute commences. On the part of the plaintiff, it is contended, *that the marriage settlement deed which has been produced* and submitted to you, bearing date in the year 1758, was duly executed and delivered on or about the time it bears date; the legal operation of which was to vest in Roger Morris and his wife Mary, a life estate, with a contingent remainder to their children, which became vested in them on their birth, and that their right and title has been duly vested in Mr Astor, by the deed bearing date in the year 1809. On the part of the defendant, it is contended, that Mary Philipse never parted with her title in the premises by the marriage settlement deed, set up on the other side, or that if she did, it was revested in her or her husband, and continued in them or one of them, until they were attainted in the year 1779, by an act of the legislature of this state, and that the title to the land in question thereby became vested in the people of this state, from whom the defendant derives title. Unless therefore the plaintiff can establish this marriage settlement deed, so as to vest a legal

estate in the children of Roger Morris and Mary his wife, he cannot recover in this action

" It will be proper for you, in examining and weighing the facts and circumstances of this case, to bear in mind, that the children of Morris and wife could not assert in a court of law their right in this land, until the death of Mrs Morris in the year 1825, and since 1825 there has been no want of diligence in prosecuting and asserting the claim.

" In the year 1809, Mr Astor purchased and acquired all the interest of the children of Morris and wife ; and you are to consider him as now standing in their place.

" The first question then is, was the marriage settlement duly executed ? In the first place, the plaintiff has produced the ordinary and usual evidence of the execution of the deed, has shown that governor Livingston was the subscribing witness, and that in 1787 he went before judge Hobart and made the usual and ordinary proof of the execution of the deed ; such as was sufficient to entitle the deed to be recorded : the hand writing of the witnesses who are dead has also been proved. Upon this proof the prima facie presumption of law is, that the deed was executed in all due form, to give it force and validity ; and in the absence of all other evidence, the jury would be justified, if not conclusively bound to say, that every thing was properly done, including a delivery. But whether delivered or not, is a question of fact for the jury.

" Delivery is absolutely essential ; a deed signed, but not delivered, will not operate to convey land. But no particular form was necessary ; if the grantee comes into the possession of the deed in any way which may be presumed to be with the assent of the grantor, that is enough, and is a good delivery in law ; and if found in the hands of the grantee years afterwards, a delivery may fairly be presumed, and it will operate from and relate back to the time of its date, in the absence of all proof to the contrary. If a deed be delivered to an agent, or thrown on a table, with the intent that the grantee should have it, that is sufficient, although no words are used. Such proof as has been given in this case, would be sufficient for a jury to presume a deli-

very, even in the case of a modern deed, and is much stronger in relation to one of ancient date. In this case, what else could be proved? Would it be reasonable to require any thing beyond what the plaintiff has proved? The witnesses are dead; their hand writing has been proved, and a proper foundation is thus laid for presuming that every thing was done to give effect and validity to the deed.

" Such being the case, the burden of proof is thrown on the other side to rebut the presumption of a delivery, warranted from these circumstances. Much stress has been laid upon the fact that the certificate of proof by governor Livingston not only states that the witness saw the parties sign and seal, but that he saw them *deliver* the deed. In stating a delivery, the certificate is a little out of the ordinary form; and it is not important, and adds little or nothing to the evidence of a due and full execution of the deed, that the word *deliver* was inserted. This insulated fact is not of much importance, for without that word, the legal effect of the proof would be the same; proof of the due execution for the purposes expressed in the deed, includes a delivery.

" What then is the evidence to bring the fact of delivery into doubt? I separate now between the release and the lease; these are two distinct questions, and I shall consider the question relative to the lease hereafter. The argument of the defendant is, that the deed was not delivered, and did not go into effect. Then what is the reasonable presumption to be drawn from the facts he has proved? keeping in mind that this is evidence, by the defendant to disprove the presumption of law from the facts proved, that the deed was duly delivered. It has been said on the part of the defendant, that the deed was probably kept for some time, and that the design to have a marriage settlement was finally abandoned. If you believe from the proof made by governor Livingston, that the deed went into the hands of the parties, then there was a good delivery, because a deed cannot be delivered to the party as an escrow. Then is there any evidence to call the delivery into question? Where is the evidence to induce the belief that the deed was executed

with any understanding that it was not to have immediate effect, or that it was delivered to a third person as an escrow, or that the parties did not intend it as an absolute delivery? You have a right to say so, if there is evidence to support it; but if there is nothing to induce such a belief, then you are to say that it was duly delivered.

"'It has been said that this was a dormant deed, never intended by the parties to operate; that it had slept until after the attainder and until the year 1787. There is weight in this, or rather there would be weight in it, if the parties in interest had slept on their rights. But who has slept? Morris and his wife, Beverly Robinson and Joanna Philipse, the trustees: they are the persons that have slept, and not the children. This does not justify so strong an inference against the children as if they had slept upon their right. Is it fair in such a case to draw any inference against the children?

"It has been said that there were three copies of this instrument; it is somewhat uncertain how many copies there were, or where they went. But suppose there were three copies, where would they probably go? Undoubtedly to the parties in interest. Mary Philipse would have one; and Roger Morris another, and the trustees the third. Mary Philipse, in a certain event, contemplated in the marriage settlement, would again become seised in fee. She therefore had an interest in having one copy; for although she had parted with the fee, she took back a life estate with the possibility of an ultimate fee in the land revesting in her. Roger Morris also had an interest under the deed, and it is therefore reasonable to presume that he had one copy of the deed. The third copy would have gone to the trustees, Beverly Robinson and Joanna Philipse. But where did this one come from? All you have on this subject is, that Mr Watts received it from Morris in 1787, to have it acknowledged. This one, for the purpose of passing the title, is as good as though all three were produced.

"It has also been urged that this deed was not recorded until 1787. Is there any thing in that fact that should operate against the children? They were minors for the greater

part of the time down to the year 1787, when it was recorded.

" It has also been urged as a controlling fact, that Morris was here at the close of the war, and did not have the deed recorded before going to England. It appears from the testimony of colonel Barclay, that Morris and his family left New York for England before the evacuation of the city by the British army, which was on the 25th of November 1783. It is well known as a matter of history, that the British were in possession of the city of New York through all the war. Is there any thing then in the fact that it was not recorded, from which an inference can be drawn against the deed? Where were the officers before whom Morris could at this time have had the deed proved? No law has been shown giving any such power, nor do I know of any such law. Then is there any just ground for a charge of negligence, even against Morris himself? After 1783 there were officers here before whom the deed might have been acknowledged or proved.

" Is there any thing in omitting to have it recorded after that time? There was only three or four years delay; and are there not circumstances reasonably to account for that, and show why it was recorded in 1787? In February preceding the time of proof and recording, the children made an application to the legislature, asserting and setting forth their claim. They were told by the report of the committee, which was adopted by the house, if you have a right, as you say you have, go to the courts of law, where you will have redress.

" This was a very proper answer. The report did not, however, as has been urged, contain any admission of their title; nor did the committee give any opinion upon the validity of the claim; and if they had, we cannot regard it. But all they or the house said, was, that if what you allege be true, you have a remedy in the courts of law. This was calculated to awaken their attention and to induce them to prove and record their deed, as a precautionary measure. It has been said that this was no more than the ordinary transaction of proving a deed, and that in the case of an old

deed, the witness finding his name to the deed, swears from that circumstance, rather than from any particular recollection, that he saw it executed. But in this case, was there not something special and particular preceding the proof of this deed; something calculated to awaken attention, and ought it to be considered no more than the ordinary transaction of proving an old deed. Governor Livingston, the witness who proved the deed, as has been proved to you, was a man of high character, an eminent lawyer, and a distinguished whig. It is fair to presume, also, that he knew what had been done just before in the legislature. Is it not reasonable then to believe that his attention was particularly called to the transaction, and that he referred back to the time of the execution of the deed, and that he would not have proved it if he had not a recollection of what then took place?

"It is reasonable to presume, his attention being awakened, that he refreshed his recollection of the original transaction. It was proved at Judge Hobart's house. Mr Watts drew the certificate. But can you presume that the witness would swear, and the judge would certify, without having read it? It is reasonable to presume that Judge Hobart, as well as the witness, knew what had taken place in the legislature in this city a short time before. This certificate is a little out of the ordinary form; it states the execution to have been at or about the day of its date: they may have thought it necessary to show that the deed was not got up to overreach the attainder. Is there any thing in the circumstances of this proof to induce the belief of unfairness?

"It is also said that Morris and his wife have done acts inconsistent with the deed. In weighing the force and effect of these acts, you must bear in mind the time when the interest vested in the children under this deed; for after that interest vested, none but themselves could divest it. It is said there is doubt as to the time when the marriage took place; but it was probably between 1758 and 1761; for in the latter year Mary Morris executed a deed as the wife of Roger Morris. I am inclined to think the law is, that after the marriage, the parties to the deed could not disannul the

deed.   But certainly not after the birth and during the life of the children of that marriage.

" We now come to the acts that are said to be inconsistent with the deed.   Those acts are of three distinct kinds or classes.   1. Those for settling the exterior lines of the patent.   2. The deeds to Hill and Merritt.   And 3. The leases for the lives of other persons.

"In estimating the weight of the first class, it will be proper for you to bear in mind the situation of the patent to Adolphe Philipse.   It was bounded north by the Kip (or Van Cortland & Co.) patent and the Beekman patent, and on the east by Connecticut.   The first class of instruments produced by the defendant relate to the Connecticut line, the Beekman patent, and the Kip (or Van Cortland) patent.   The first deed is that of January 18th, 1758 : this relates to the boundary of the Beekman patent.   You will see from this deed, and its recital, what the parties intended.   It recites an agreement in 1754, to settle the lines of the two patents.

" You are not necessarily to take this as having been executed after the marriage settlement deed : delivery is what gives validity to a deed.   Certainly Mary Philipse was not married at the time this deed was made ; for if she had been, she would have signed it as Mary Morris.   If she was not married, and had not executed the marriage settlement deed, she was seised in fee of the land, and had the absolute control over it.

"Again, it does not appear how much of the Philipse patent was conveyed by this deed ; and it was made in pursuance of an agreement in 1754, to settle the boundary.

"The next is the patent to Philipse, Robinson and Morris, growing out of the settlement of the Connecticut line.   The government settled the line between New York and Connecticut, making it a straight line, instead of one parallel to the Hudson river, according to the patent : and this patent was given to Morris and others for the lands lying on the west side of that line.   And the patent recites, that Morris and his wife had released to the king the land taken from the Philipse patent by the new line.   This was an act to settle boundaries.   Again, it is to be observed, that Robinson and

Morris were both married; and yet the patent was not given to their wives, but to the husbands.

"The interest Morris had in the land, was a life estate under the settlement deed, the same as it would have been without it. Without that deed, he had a life estate as tenant by the curtesy.

"Morris, instead of taking this patent to his wife or children, or in trust for them, took it to himself. He might, however, be considered as taking the land in trust for his children. But this alleged inconsistency of Morris is just as great without as with the settlement deed.

"The next is the deed to Verplank, in relation to the Kip or Rumbout patent. It does not appear that this deed conveyed any of the Philipse patent. But suppose it did, it does not necessarily follow that it was intended to assert any right in hostility to the marriage settlement deed. Is it not a fair and reasonable presumption, these children being infants, that the parents meant this as a settlement of difficulties about boundary, for the benefit of the children, and not that they intended to act in hostlity to the deed? It was the act of parents, and not of strangers. The intention with which all these acts were done, is important; as they are introduced to show that Morris and his wife have acted inconsistently with their right under the marriage settlement deed.

"We are next to consider the deeds to Hill and Merritt. Are these hostile to the settlement deed? If there had been no power to sell any part of the land, they would have been strongly inconsistent with the settlement deed. But that deed contains a power expressly giving them the right to sell in fee to the value of three thousand pounds. They have only sold to the amount of one thousand one hundred and ninety-five pounds, and so are within the power. But it has been said that these deeds do not recite the power— that was not necessary: the purchasers in these (Hill and Merritt) deeds would acquire as valid a title as if the power had been recited. These deeds are, therefore, not inconsistent with the settlement deed.

"The next thing to be considered is the three life leases. Were these such acts of hostility as to induce the belief that

the settlement deed was not delivered ? It has been argued on the part of the plaintiff, that the word *dispose,* in the power, would authorise these leases as well as sales in fee. This I think is not the true construction of the power : looking at the latter part of the power, it is evident that by the words *sell and dispose of,* they only contemplated sales, and not leasing for life or lives. And so, in strictness of law, they had no power to make these leases for lives. But if they had no such power, still the question returns, how is that to affect the rights of the children; and did they intend it in hostility to those rights ? It could not affect their interest in the land. The question is not what was the legal effect of these acts, but how did Morris intend them? Did he actually mean to act in hostility to the deed ? That is the question. You are not to construe it an act of hostility, unless it was so intended by Morris. It was a new country : clearing and improving the lands was for the benefit of the children ; and if Morris so intended these leases, they are not hostile to the deed. These are all the circumstances relied upon as being inconsistent with the settlement deed; and they are questions for you. I do not wish to interfere with your duties. It is for you to say whether the deed was duly executed and delivered.

"The next question for your consideration, is whether there was a lease as well as a release. In the judgment of the court, a lease was necessary to convey a legal estate to the children, and through them to Mr Astor. Without a lease, this deed would only have operated as a bargain and sale, and the statute (for reasons that I need not stop to explain) would not have executed the ulterior uses. So a lease is indispensable to the plaintiff's title. Then the question is, are you satisfied that a lease was executed ? This, perhaps, is the stress of the case. On this subject, questions of law are intermingled with the facts. The plaintiff says that the recital in the release is conclusive evidence of the lease ; such evidence as cannot be disputed. If so, then it would operate as a technical estoppel, and Carver's mouth would be shut, and he would not be permitted to dispute the ex-

istence of the lease, whether there was one in point of fact or not.   But it is not enough to make it an estoppel, that the defendant claims under the same party: he must claim under or through the same deed, or through the same title. Here neither the defendant nor the state claim through this deed : they claim in hostility to it ; they say there never was such a deed ; they claim the interest that was in Mary Philipse in 1754.   This recital is not, therefore, to be considered a technical estoppel.

" The question then is, whether the recital can operate in any other way ?  The court has before decided in your hearing, that this recital is evidence for the jury; and it is for you to say what weight and importance it ought to have. The defendant has excepted to the decision of the court that this is evidence ; and if the court should have mistaken the law, the defendant will have his redress.   You are therefore, to take this recital as evidence legally and properly admitted ; and if legal evidence, it is evidence for some purpose. It would be absurd for the court, after deciding that it is legal evidence, to tell you not to consider it, or that it is entitled to no weight or importance.   You must therefore regard this recital as evidence.

" The recital being evidence, the question is for you to decide what is its weight and importance ?  In recent transactions, where the party can have other evidence of the fact, recitals are of little weight.   But in ancient transactions, they are of more weight and consequence.   There may be no witness to prove the fact.   And the force and importance of a recital may be greater or smaller, according to the facts and circumstances of each particular case.   Here the lease is lost, and it cannot therefore be shown who were the witnesses to it, nor with certainty what it contained.   The witnesses to the release are dead, and the plaintiff could not therefore be called upon to produce them.   In the proof of ancient transactions, the rules of evidence must be relaxed in some measure, to meet the necessity of cases.   Where witnesses cannot be had we have to resort to other proof. These will have greater weight in some cases than in others.

If the case is stripped of any fact or circumstance to in-
duce a suspicion of fraud, then a recital will have greater
weight.

"From the release, it is reasonable to presume that the par-
ties intended to convey a legal estate. This deed, if not
drawn by governor Livingston, was most likely drawn under
his advice and direction, and is it not fair to presume that he
drew the proper deeds to carry into effect the intentions of
the parties.? If he acted fairly, he would have done so ; and
is it not a fair presumption that he drew such an instrument
as was customary at that day, and deemed necessary to con-
vey the legal estate?

"It is proved that the lease and release was the ordinary
mode of conveyance. Judge Benson says, that was the uni-
form practice ; and colonel Troup says the same. This is an
additional circumstance to induce the belief that a lease was
executed, and it is for you to determine whether the circum-
stances are sufficient to satisfy you that what was usual and
in accordance with the ordinary course of business, was done
in this case.

"But it is objected that the lease is not produced. The
plaintiff has, in the opinion of the court, accounted for this,
by proving it lost. It has been shown not to have been the
general practice to record the leases with the releases ; very
few appear ever to have been so recorded in proportion to the
releases, and those produced in court, on the part of the de-
fendant, have never been recorded. It has been said that the
lease had performed its office the moment the release was
executed, and was no longer of any moment. This is not
correct ; but if the parties were under that impression, it will
in some measure account for their not keeping it with greater
care.

"If you are satisfied, from the evidence, that there was a
lease duly executed, then the plaintiff has a right to recover,
unless some act has since been done changing the rights of
the parties.

"The defendant's counsel have urged that this is not a case
for presumptions in favour of the existence of a lease ; that

presumptions can only be resorted to when the possession accords with the fact to be presumed. There may be some question on this point. I have examined all the cases cited, but I find none that come precisely to this case. So far as I understand the cases, presumptions cannot be resorted to in hostility to the possession. The mere fact of a naked possession proves but little. Courts, therefore, admit evidence of the declarations of parties in possession of land, to show how they hold. In this case the possession may be considered equivocal. Morris and wife would have been entitled to the possession, whether there was or was not such a deed; and presuming a lease, would not necessarily be presuming a fact in hostility to the possession. If you are therefore satisfied that Morris and wife were in possession, holding under the deed of marriage settlement, presumptions may be indulged in favour of the existence of the lease. But if you consider them holding the possession, in hostility to the marriage settlement, it is not a case for presuming a lease.

" A lease and release are considered but one instrument, though in two parts. The absence of the lease is not the loss of an entire link in a chain of title, but it is a defect of a part of one instrument. Suppose a deed purporting to pass a fee, produced without a seal, and from the lapse of time or other cause, there is no appearance of its ever having had a seal? Then the party must show that it had been sealed, for otherwise it would not pass the fee. By what kind of evidence could this fact be established? Would it not be proper to look at the conclusion and attestation of the deed—Signed, *sealed*, &c.? Would it not also be proper evidence, to show it was drawn by a man who knew that a seal was necessary to pass the estate, and other circumstantial evidence, and for the jury, from evidence of this description, to presume and find that the instrument was duly sealed, to supply the defect and infirmity of the deed?

" If you are satisfied the lease, as well as release, was executed and delivered, a legal estate has been shown in the

[Carver *vs.* Jackson ex dem. Astor et al.]

heirs of Roger and Mary Morris, and the plaintiff will be entitled to recover, unless that title has been revested in Roger and Mary Morris, or one of them.

" It is said that the title has been revested in Mrs Morris, by some conveyance, since the settlement deed. This you may presume, if in your opinion the evidence will warrant such presumption. But no redelivery, cancelling or the like, would have that effect; there must have been a re-conveyance. This must also have been made before the marriage, or at the utmost length, before the birth of a child; therefore you can only look to circumstances arising before the marriage, or before the birth of a child; unless you should be of opinion that the acts of Roger Morris and his wife, which have been given in evidence, were in hostility to this marriage settlement deed. The children may have reconveyed since they came of age. But the circumstances do not weigh very strongly against them before 1825, when they were first in a condition to assert their rights. There cannot be any very strong grounds for supposing the children ever reconveyed. And if there is any thing to satisfy you there was a reconveyance, you will say so; and it will defeat the plaintiff's right to recover. But in my judgment, the result will depend principally upon the question, whether a lease and release were duly executed and delivered, so as to pass the legal estate.

" The deed of the state only passed such right to the defendant's father as the state had; and if the marriage settlement deed has been established, that was nothing more than the life estate of Morris and wife. It is not necessarily to be inferred from any of the acts read, that the state intended to take any greater interest than such as the persons attainted had. They sold what the commissioners of forfeitures judged had been forfeited. They did not examine into the state of the title, but only exercised their judgment upon such information as they had. It was for that reason that the state conveyed with warranty. The state cannot be presumed to have intended to conclude the rights of third persons who were not attainted. If, therefore, you

shall find that the marriage settlement deed, consisting of a lease and release, was duly executed and delivered on or about the time it purports to bear date, the children of Roger and Mary Morris acquired under it a contingent remainder, which became vested on their birth; and the plaintiff will be entitled to recover unless that interest was destroyed or put an end to by some subsequent reconveyance, of which you will judge and determine."

Upon this charge, and on the opinion, the court left the case to the jury. A verdict and judgment were rendered for the plaintiff; and the defendant prosecuted this writ of error.

The case was argued for the plaintiff in error by Mr Bronson, attorney general of New York and Mr Webster; and for the defendant by Mr Ogden and Mr Wirt.

For the plaintiff in error, the following points were made:

I. No estate ever vested in the children of Morris and wife under the settlement deed.

1. The remainder limited to the children by that deed, was a contingent remainder, and could not vest in the life time of their parents.

2. By the attainder and banishment of Morris and wife in 1779, they became civilly dead, and their estate in the land determined: and the contingent remainder to the children failed for the want of a particular estate to support it.

3. If the attainder and forfeiture worked no more than an assignment of the particular (or life) estate; then the conveyance by the state of New York in 1782, to Timothy Carver, with warranty, was equivalent to a feoffment by the tenant for life, and destroyed the contingent remainder depending on that life estate.

4. By the attainder of Beverly Robinson, the surviving trustee in 1779, and the forfeiture of all his estate to the people of the state of New York, all seisin in the trustee to serve the contingent uses to the children was divested. The state cannot be seised to a use; and so there was no seisin to serve the contingent uses to the children, when the

event upon which they were to vest happened : and the state took the land discharged of the subsequent limitations in remainder.

II. Under the settlement deed (without a lease) the children could not take legal, but only trust or equitable interests in the land.

III. The judge erred in admitting evidence to prove the loss, before it had been shown that a lease ever existed.

IV. The plaintiff did not prove the loss, nor did he sufficiently account for the non-production of the lease, and was not entitled to give secondary evidence of its contents.

1. The release states it was executed in three parts—there must also have been three parts to the lease : and the plaintiff should have accounted for all the parts, before being permitted to give secondary evidence of the contents.

2. Most of the evidence of searches for the lease, was of a loose and unsatisfactory character—depending, as to its sufficiency, upon mere hearsay evidence.

3. No sufficient search was proved among the papers of Mary Morris, formerly Mary Philipse.

4. No search was shown to have been made among the papers of Joanna Philipse, the mother of Mary Morris and one of the trustees.

5. No search was proved in the office of the secretary of state, where the release was recorded. Nor was any proved in the clerks' office of the counties of Dutchess and Putnam, where the land is situated.

6. A search, by a third person, among the papers of the children and heirs of Roger Morris and his wife, who were lessors of the plaintiff, was not sufficient. Those lessors were competent witnesses upon the question of loss, and should have been sworn, or examined on commission.

7. The other lessors of the plaintiff, Messrs Colden, Fowler, and Bogert, should have been sworn, as well as Mr Astor, to prove that they had not got the lease.

8. It should have been shown where the release came from, when it came into the hands of the plaintiff, or Mr Astor, and that the lease was not in that place.

V. The recital in the release does not bind the defendant by way of estoppel, nor is it evidence against him.

VI. This is not a case where a lease or other conveyance can be presumed.

VII. The plaintiff was not entitled to recover without proving the actual execution of a lease.

VIII. Evidence of what were the contents of a lease in a particular case between other parties, was not competent evidence to prove what were the contents of the lease in this case.

IX. If a lease of some kind was executed, the plaintiff was not entitled to recover on proving it lost, without also proving what were its contents.

X. The judge admitted evidence which was not pertinent, and which may have misled the jury.

1. A common practice to convey land by lease and release was not competent evidence to prove that a lease was executed in this case, or what were its contents.

2. The professional character of governor Livingston was not competent evidence to prove either a lease or its contents.

3. Proof that it was not usual to record leases, was not competent evidence to prove the loss of a lease in this case.

4. Proof of what was the usual recital of a lease in a deed of release, was not competent evidence for any purpose.

5. The journal of the assembly was not legal or competent evidence against the defendant.

6. The acts of the legislature of the state of New York, relative to the claim of Mr Astor, were not competent evidence against the defendant.

7. Proof that this suit was defended by the state of New York, was not competent evidence against the defendant.

XI. The judge misdirected the jury on the question of a delivery of the settlement deed.

XII. The judge misdirected the jury as to the grounds upon which they might find there was a lease as well as a release.

[Carver vs. Jackson ex dem. Astor et al.]

XIII. The judge should have instructed the jury that this was a proper case for presuming a conveyance.

XIV. Roger Morris, and Mary his wife, under the marriage settlement deed, had an interest in the land, and might convey in fee, to the amount of three thousand pounds in value. They did convey to the amount of one thousand one hundred and ninety-five pounds in value, and the residue of that interest was forfeited to and vested in the people of the state of New York; and the power was well executed by the conveyance of the commissioners of forfeitures to Timothy Carver, the defendant's grantor.

XV. The whole title, both in law and equity, which may or can have vested in the children and heirs of Roger Morris and Mary his wife, of, in and to the lands and premises in question, has not been, as between the grantors and grantee, legally transferred to the said John Jacob Astor, his heirs and assigns.

XVI. A proper deed of conveyance in fee simple, from the said John Jacob Astor, and all persons claiming under him, to the people of the state of New York, would not be valid and effectual, to release, transfer, and extinguish, all right, title, and interest which now is, or may have been vested in the children and heirs of the said Roger Morris and Mary his wife.

XVII. The plaintiff's action is barred under the act limiting the period of bringing claims and prosecutions against forfeited estates.

XVIII. The plaintiff's action is barred under the general limitation act of 1788; and also under the general limitation act of 1801.

XIX. The plaintiff was bound to pay for the permanent improvements upon the land, by which its value had been increased.

Mr Bronson, for the plaintiff in error, contended; that on the true construction of the deed of settlement, no estate vested in the children of Roger Morris and wife. Morris and wife took upon their marriage an estate in the land for the term of their natural lives, and the life of the survi-

[Carver vs. Jackson ex dem. Astor et al.]

vor, with a contingent remainder in fee to the children, which could not vest in the life time of their parents. The uses in the deed, were : 1. To the trustees until the marriage. 2. To Morris and wife for life. 3. From and after the determination of the life estate to such children as might be born of the marriage. 4. But if they should have no child or children, or such child or children should happen to die in the life time of their parents, then either to Mrs Morris, or to such persons as she should devise the same.

Thus the remainder was contingent and did not vest during the life of the parents; and it afterwards failed for the want of a particular estate to support it, the life estate of Roger Morris and wife having been forfeited. It was the obvious meaning of the deed, that the residue of the estate should go to the children, if they survived the mother; and if not, to her, as either event should take place. It was thus a remainder limited to two persons, or classes of persons, depending on survivorship; and until the happening of the event it could not become a vested estate in either.

This was the effect of the limitation over, and such a limitation is good at common law. There may be two concurrent remainders or contemporary fees, called alternate remainders; the latter to take effect in case the first shall fail. Laddington vs. Kime, 1 Lord Ray. 203. The same case is reported, 1 Salk. 224. 1 Preston on Estates, 488, 493. The case before the court is more properly one fee; one remainder; and is like the ordinary case of a remainder limited to the survivor of two or more persons.

In answer to the allegation that the children on their birth took vested remainders in fee, and that the limitations over, in case of the death of the children, could only have taken effect by way of shifting use; it is urged that although by conveyances deriving their operation from the statute of uses, estates may be limited differently from the limitations by conveyances at common law, yet the difference between a remainder and a shifting use is, that a remainder must be limited to take effect in possession upon the regular determination of the estate which precedes it; but a shifting use

does not take effect upon the regular determination of the preceding estate, but in derogation or abridgement of that estate. 1 Preston on Estates, 117, 92, 93. Cruise's Dig. Rem. ch. 5, sec. 19, 36.

Springing and shifting uses, and executory devises are only admitted in cases of necessity, and it is well settled that where a limitation can take effect as a remainder with a sufficient freehold estate to support it, it shall not be construed as a springing or shifting use, or as an executory devise. Laddington vs. Kime, before cited. Doe vs. Holmes, 3 Wils. 243. Goodtitle vs. Billington, Doug. 725, 753. Fearne on Ex. Dev. 5.

The principles of these cases fully apply to this case. There was no difficulty in giving effect to the limitation to Mrs Morris, or her devisee as a remainder, construing the deed as giving the residue of the estate to the one or the other according to survivorship. Thus no estate could vest in the children during the life time of their parents. They had no certain or fixed right of future enjoyment. The case is therefore within the fourth class of cases, as they are arranged by Mr Fearne; the person, though in esse, was not ascertained. Fearne on Contingent Rem. 2, 3, 5, 9. Biggott vs. Smith, Cro. Car. 102. Co. Lit. 378, A. Cruise's Dig. Rem. ch. 1, sec. 8. Bac. Ab. Rem. and Rev. D. 1 Preston on Est. 77. Leonard Lovie's Case, 10 Co. 85, 86. 3 Coke, 20. 1 Plow. Rep. 20. Smith vs. Belay, Cro. Eliz. 630.

It is not the event which is to determine the preceding estate, but that which is to give effect to the remainder, which distinguishes a contingent from a vested remainder. 1 Preston on Est. 67, 70, 71. If the remainder to the children was vested in interest, it might be aliened or devised, and on their death it would descend to their heirs; and the limitation to the mother, and her devisee might have been defeated, notwithstanding the death of the children before their parents. It is therefore evident that the remainder was contingent until the question of survivorship was determined. 1 Preston on Est. 64. Cruise's Dig. Rem. ch. 1, sec. 9. Doe vs. Provoost, 4 Johns. Rep. 61. Den vs. Bagshaw, 6 Durnf. & East, 512.

There are some cases upon wills, where the courts, to carry into effect the intention of the testator, have held a contingent disposition of the estate to be a condition subsequent, to divest the estate, and not a condition precedent. 4 Bos. & Pul. 313. 14 East, 601. 1 Maule & Sel. 327. 2 Johns. Cases, 314. But in these cases the estates in remainder were so limited as to take effect in possession upon the regular determination of the preceding estate; or where it was necessary to effect the intention of the testator so to construe the limitation. The cases of Doe *vs.* Martin, 1 D. & E. 39. The Earl of Sussex *vs.* Temple, 1 Lord Raym. 311. Matthews *vs.* Temple, Comberb. 407, do not interfere with the principles contended for on the part of the plaintiff in error.

2. The contingent remainder to the children failed upon several grounds:

1. By the attainder and banishment, by which Morris and wife became civilly dead, and their estate determined; there being from that event no particular estate to support it.

Banishment for life works the civil death of the party. Co. Litt. 133. 1 Blac. Com. 132, 133. 4 Johns. Ch. Rep. 218. 6 Johns. Ch. Rep. 118. The remainder must vest in interest during the continuance of the particular estate, or the moment of its determination, or it is gone for ever. Fearne on Cont. Rem. 307, 326, 389. Cruise's Dig. Rem. ch. 6, sec. 35, 36. 2 Saund. Rep. 386. Thompson, *vs.* Leach, 1 Lord Raym. 316. Lloyd *vs.* Brooking, 1 Ventris, 188. 2 Salk. 576. In the cases of Corbet *vs.* Tickborn, 2 Salk. 576, and Linch *vs.* Coote, 2 Salk. 469, where it was held, that by attainder for treason of the tenant for life, the crown takes no other than the interest of the tenant; there was in the first case a still subsisting life estate to sustain the remainder; and in the second case, the remainder was actually vested.

In Borland *vs.* Dean, 4 Mason's C. C. Rep. 174, it was held that the confiscation of the estate of the tenant for life did not defeat the remainder. But this was on the ground that it was a vested, and not a contingent estate at the time of the confiscation.

2. If the attainder and forfeiture worked no more than

an assignment of the particular and life estate, then the conveyance by the state in 1782, to Timothy Carver with warranty, was equivalent to a feoffment by the tenant for life, and destroyed the contingent remainder depending on that estate. Fearne on Cont. Rem. 316, 318. Cruise Dig. Rem. ch. 6. sec. 1, 7. 2 Saunders, 386. It is true that a bargain and sale by tenant for life will not destroy a contingent remainder, as it passes no greater interest than the person has. But the statute of New York, under which the commissioners acted, is part of the alienation as well as the deed, and the statute gives the deed of the commissioners all the effect of a feoffment with livery at common law.

3. By the attainder of Beverly Robinson, the surviving trustee in 1779, and the forfeiture of all his estate to the people of the state of New York, all seisin in the trustee to serve the contingent uses to the children was divested; and thus the remainder to the children of Roger Morris and wife was destroyed.

The state cannot be seised to a use; and so there was no seisin to serve the contingent remainder to the children, and the state took the land discharged of the subsequent limitations.

It is necessary to the execution of a use, that some person should be seised to the use. Gilbert on Uses and Trusts, 125. Chu``eigh's Case, 1 Coke, 132. 1 Saunders on Uses and Trusts 117, 181. 7 Cruise's Dig. Uses, ch. 3, sec. 78. Cruise's Dig. Rem. ch. 5, sec. 9.

The king cannot be seised to a use, but by prerogative holds the lands discharged of the use; and the people of the state of New York have succeeded to all the rights and prerogatives of the former sovereign. Cruise's Dig. Use, ch. 2, sec. 37. Cruise's Dig. ch. 3, sec. 9, 10. Vin. Ab. Uses (*c*). Gilbert on Uses and Trusts, 5, 6. The People *vs*. Herkimer, 4 Cow. 345. The People *vs*. Gilbert, 18 Johns. Rep. 227.

The counsel then proceeded to argue that there should have been a lease, in order to sustain a marriage settlement. That the loss of the lease was not proved. But the court having decided that the recital of the lease in the deed of

the 13th of January 1758, was evidence between these parties, of the original existence of the lease, the argument upon these points is omitted.

It was further argued that the recital in the lease does not bind the plaintiff in error by way of estoppel, nor is it evidence against him.

The circuit court held that the recital was not an estoppel, but that it was evidence against the defendant in that court, of the existence of the lease.

It was not such evidence. The defendant did not claim under or through the deed, but claimed adversely to it, and deduced his title from the patent to Adolphe Philipse in 1697. The plaintiff then set up a deed of seventy years standing, wholly disconnected with the defendant's claim of title; save that it was executed by one of the persons through whom the title had passed. It is denied that it could be evidence against any one but the party who made it, and, possibly, his heirs and personal representatives, or others standing in his place.

It is not denied that the deed without the lease is good and valid, and divests the title of Mary Philipse, as effectually as if a lease had been made; but without a lease the legal title is not placed where the plaintiffs below require it.

It is important to consider that there never has been a holding under this deed. Morris and wife were entitled to the possession of the estate without the deed, and it is necessary to look beyond the deed to ascertain under what title they hold. There is no evidence which shows that the deed was ever referred to by them as valid or subsisting; but by a series of acts altogether unequivocal and adverse to the deed, they exercised full ownership over the property, by granting it in fee, or on leases for life; acts inconsistent with the deed.

The doctrine, that the recital is evidence against the defendant, goes the whole length of determining that an admission, made by any person through whom a title has passed, binds every one to whom the title may come; and that a deed, to which a party is a stranger, and under which there

has been no holding, not only binds him, by way of divesting the title of his grantor, but that he is also bound by any admission it may contain.   The king is not bound by estoppels.  Vin. Ab. Estoppel, (U, 2.)  Nor are the governments of the states of the United States bound by them.  Elmendorf *vs.* Carmichael, 2 Litt. Rep. 481.

The old doctrine was, that a recital did not bind any one, not even the party to the reciting deed.  Vin. Ab. Estop. M. pl. 5, 7.   Co. Litt. 352 (*b*).   But it is admitted, that a different rule now prevails, and that recitals are for the most part evidence against the party to the deed, his heirs, and those standing strictly in the character of representatives; and against persons claiming through or under the deed. Denn *vs.* Correll, 3 Johns. Cas. 174.   Will. Rep. 9.   Willoughby *vs.* Brooke, Cro. Eliz. 756.   Com. Dig. Testmoigne (*b.* 5).   But in 2 Starkie on Ev. 30, it is said " a recital is not evidence against a stranger to a second deed;" and a man is a stranger to a deed when he does not claim under it, although he may claim under the same grantor.

The cases relied upon to support the position of the defendant in error do not warrant the conclusion claimed from them.  Ford *vs.* Lord Gray, 1 Salk. 285.   6 Mod. 44.   In these cases the claims were under the grantor, in and under or through the reciting deed.

It is believed that no case can be found where the point has been adjudged, that a recital was evidence against one claiming under the party to the reciting deed, but not through it, unless where there has been a possession not to be accounted for, but on the truth of the recited fact.  In such a case it may be evidence against a stranger.   Norris's Peake's 164.

Estoppels by verdict, admissions on record, &c. bind all privies.  1 Phil. Ev. 245.   Because they operate on the interest in the land, and divest the title.   1 Salk. 276.   But a recital is mere matter of admission, which does not operate on the title to land, nor affect it in the hands of a grantee of the person making the admission.   Even the heir is not always bound by that which would estop his ancestor.  Good-

title *vs.* Morse. 3 T. R. 365. Kercheval *vs.* Triplett, 1 Marshall's Ky. Rep. 7, 494.

The judge admitted evidence which was not pertinent, and which may have misled the jury.

1. A common practice to convey land by lease and release, was not competent evidence to prove that a lease was executed in this case, or what were its contents. 2. The professional character of governor Livingston, was not competent evidence to prove either a lease or its contents. 3. Proof that it was not usual to record leases, was not competent evidence to prove the loss of a lease in this case. 4. Proof of what was the usual recital of a lease in a deed of release, was not competent evidence for any purpose. 5. The journal of the assembly, was not legal or competent evidence against the defendant. 6. The acts of the legislature of the state of New York, relative to the claim of Mr Astor, were not competent evidence against the defendant. 7. Proof that this suit was defended by the state of New York, was not competent evidence against the defendant.

It may be said that this evidence was unimportant : it is for that very reason that we complain of its admission. And unless the plaintiff can show that it was legal evidence between these parties, and upon the questions to be tried, the judgment must be reversed; for it is impossible to say, that the jury did not found their verdict upon it.

For what legitimate purpose were the acts of the legislature concerning the claim of Mr Astor given in evidence? If to excite the sympathy, or operate upon the prejudices of the jury, it was an improper and illegal purpose. We attempted to defend James Carver, and against him the plaintiff was to establish his right.

If the acts in question contained any admission in favour of the plaintiff's title, will it be contended that the legislature could destroy or admit away the vested rights of James Carver? But those acts denied the title of Mr Astor, and referred him to the courts of law to establish it by proof; and he was to do that against the tenants upon the land, not against the state.

[Carver *vs.* Jackson ex dem. Astor et al.]

Again, those acts proposed a compromise to Mr Astor; but there was no evidence that he had ever accepted those terms of compromise.

And how did it tend to establish the title of Mr Astor, or any thing concerning it; to show that this suit was defended by the state of New York? If not legal evidence, a reversal of this judgment is asked. If Mr Astor has a title to this land, he must prove it by legal and pertinent evidence.

The judge of the circuit court misdirected the jury on the question of the delivery of the settlement deed.

The force of this objection can only be seen by referring particularly to the case of the plaintiff below.

The evidence offered was the affidavit of Mr Livingston of the execution of the deed, and that of Mr Hoffman of the hand writing of the subscribing witnesses, both of whom were proved to be dead. The affidavit of Mr Livingston was made, not from a recollection of the execution, but from his name having been subscribed as a witness. This was prima facie proof to put the instrument on record, and amounted only to presumptive evidence of a delivery of the deed. When a subscribing witness is called to prove the execution of a deed, two distinct facts are to be established. 1. The sealing or execution. 2. The delivery. 1 Stark. Ev. 331, 333, 334. 2 Stark. Ev. 473, 475, 477. Jackson *vs.* Phipps, 12 Johns. 418. Where the witness is dead, proof of the hand writing, furnishes presumptive evidence of sealing and delivery; if there has been possession under it, or the deed comes from the grantee. But in the absence of possession, or where the deed was never in the hands of the grantee, the presumption is very slight. Such proof of a deed as will entitle it to be recorded, is certainly no stronger than an acknowledgement by the party that he executed it as his act and deed, for the uses and purposes therein mentioned, and in neither case is the evidence conclusive, but only prima facie or presumptive, and such as may be rebutted. Jackson *vs.* Dunlop, 1 Johns. Cases, 114. Maynard *vs.* Maynard, 10 Mass. 456. Gardner *vs.* Collins, 3 Mason, 398. These cases sufficiently establish, that the proof or acknowledgement, and

the recording of a deed, furnish only *prima facie* evidence of delivery.

But upon the whole case it is thought that any evidence of a presumption that there was an actual delivery of the deed, so that it became an operative and valid conveyance, was entirely destroyed by the facts of the case. The deed was prepared in contemplation of marriage, and necessarily was not to be delivered until the moment of the marriage ceremony. This must have been the case; as by its terms, if the marriage did not occur, the estate would be held by the trustees. The marriage did not take place immediately, for Mary Philipse, on the 18th of January 1758, executed a deed for a part of the land in her own name. She appears to have been married before the 5th of March 1761. It is probable the deed was thrown aside, increased confidence in Morris having made it of no importance; and that it was only brought forward afterwards for the purposes for which it is now set up. It was not recorded until 1787, although all the other title papers of the family were put on record. The recitals in the deeds given after it, state all the circumstances of the title under Adolphe Philipse, but no deed recites this, or in any manner refers to it. There was no evidence that the deed had been seen after its execution in the hands of the trustees; or seen at all, until 1787, when it was produced by the grantor. Upon such facts it is difficult to believe that it was at any time before the revolution a subsisting conveyance.

Other important facts were proved. The deeds before the war, given by Morris and wife, grant and convey a fee simple in the parts of the land contained in the settlement, and do not mention a life estate. In settling the line with Connecticut, the surrender to the crown does not mention the trust deed; the parties style themselves owners and proprietors, and the grant of land, in consideration of the surrender, is to Roger Morris, and not subject to the pretended settlement. Beverly Robinson, a trustee under the deed of 1758, should have protected the trust, but he was a party to the compromise with the crown, under which five thousand acres were acquired in his own right by Roger Morris

[Carver *vs.* Jackson ex dem. Astor et al.]

· The misdirection of the court was in telling the jury that the evidence by which the delivery was brought into doubt was of no legal effect or importance. · There was one error which pervaded every part of the charge in this particular. While the question was, whether there was any deed, duly perfected by delivery, under which the children had rights; the judge assumed that fact and made it the basis of destroying the legal effect of that evidence, given to disprove it. That this was a dormant deed, which had slept for twenty-nine years, went very strongly to impeach its validity; and the judge said, " there is weight in this, or rather there would be weight in it, if the parties in interest had slept on their rights." He then says, ' the children have not slept," and asks, " is it fair in such a case to draw any inference against the children." This assumes the very fact in controversy, that there was a deed; and therefore that it was improper to draw any inference against the children from the acts or omissions of others.

· He also contended, that the court misdirected the jury upon the omission to record the deed, and on the acts and conveyances of Morris and wife in disregard of the deed of 1758.

Several of the deeds are disposed of by the court, by saying they were to settle boundaries; but they asserted a right to the lands in fee, and for what purpose they were made, was of no moment. In relation to the leases, the judge said that Morris and wife, " in strictness of law," had no power to make them; but he adds, " how is that to affect the rights of the children?" This was equivalent to saying the children had rights; the very question in the cause.

Upon the whole, it is evident that the court left nothing to the jury on the question of delivery. He also said, that in his charge he had laid before the jury all the circumstances relative to the question of delivery; but he had omitted to state that this deed came out of the hands of the grantor; and some other facts important to the cause.

The judge should have instructed the jury that this was a proper case for presuming a re-conveyance.

The judge told the jury that they might, presume a re conveyance, if they thought the evidence would warrant the presumption; but he also said that in his judgment the case depended principally upon other grounds. It was in fact saying that it was not a proper case for presuming a re-conveyance.

The presumption of such a conveyance was in accordance with the actual holding of the property from 1758 to the day of the trial; and all the parties connected with the title have acted at all times as though such were the fact.

In New York, and the local law governs in this case, the rule concerning presumptions of conveyances is in favour of the claims of the plaintiff in error here. 2 Wendell's Rep. 36. Ham *vs.* Schuyler, 4 Johns. Ch. Rep. So too in England, a re-conveyance of the legal estate was presumed after a great lapse of time, though the possession was not originally adverse, but under a trust. And this case received the sanction of this court in Provost *vs.* Gratz, 6 Wheat. 418.

Roger Morris and Mary his wife, under the marriage settlement deed, had an interest in the land, and might convey, in fee, to the amount of three thousand pounds in value. They did convey to the amount of one thousand one hundred and ninety-five pounds in value, and the residue of that interest was forfeited to and vested in the people of the state of New York; and the power was well executed by the conveyance of the commissioners of forfeitures to Timothy Carver, the defendant's grantor.

In relation to the deeds to Hill and Merritt, the judge held that they were a good execution of the power in the settlement deed: but on this part of the case he held, admitting that the unexecuted portion of the power passed to the state by the forfeiture, yet that the conveyance to Timothy Carver by the state was not a good execution of the power. If Morris and wife could execute the power without reciting or professing to act under it, why could not the state do the same after they acquired the title?

If the power is to be regarded as an exception out of the grant, then Morris and wife had an interest or estate in the

land, and they might convey without reciting the power. And it is equally clear that the residue of that interest or estate not aliened, passed by the forfeiture; and so the defendant acquired a good title by the deed from the commissioners.

We think this power received different constructions upon different questions: and that either the Hill and Merritt deeds were inconsistent with the settlement deed; or that the defendant acquired a good title under the commissioners' deed.

The whole title, both in law and equity, which may or can have vested in the children and heirs of Roger Morris and Mary his wife, of, in and to the lands and premises in question; has not been, as between the grantors and grantee, legally transferred to the said John Jacob Astor. his heirs and assigns.

A proper deed of conveyance in fee simple, from the said John Jacob Astor, and all persons claiming under him, to the people of the state of New York, would not be valid and effectual, to release, transfer, and extinguish, all right, title and interest, which now is, or may have been vested in the children and heirs of the said Roger Morris and Mary his wife.

These questions arise upon the admissions made by the parties before the jury, and which appear upon the record.

If the remainder to the children was contingent, and not to vest until the death of both their parents, then it is quite clear that it could not be aliened until the question of survivorship was determined. But if the court should hold that the remainder to the children was vested, subject to be divested by way of a shifting of the use, on the event of their dying before their mother; then we contend that they could not alien to a stranger, although they might release to a person having an interest in the land. And if the conveyance would bind the party to it by way of estoppel, still it would not bind their heirs. Goodlittle *vs.* Faulkner, 3 T. R. 365. Kercheval *vs.* Triplett, 1 Marshall's Ken. Rep. 494. 1 Preston on Est. 75, 76. Viner's Ab. Release, G. Lampet's case, 10 Coke, 46. Hoe's case, 5 Coke 71. Com.

Dig. Grant, D. Assignment, C. 3. Davis *vs.* Hayden, 9 Mass. 514, 519.

The plaintiff was bound to pay for the improvements upon the land, by which its value had been increased.

The substance of the provisions of the acts of the legislature of New York is : that the purchaser of any forfeited estate, in case of eviction, should be paid the value, at the time of the eviction, of the improvements he had made on the land; not for his labour or expenditures, but the amount by which that labour and those expenditures should have increased the value of the land. The party who recovered his land would only pay the difference between the value of the land at the time of the recovery, and what it would be worth at the time of the recovery without the labour and expenditures of the party evicted. This provision is both just and equitable.

It is contended, that these provisions of the laws of New York are in conflict with the treaty with England in 1783.

The acts are general in their terms and in their operation; they have no relation to the character or country of the person who should recover lands which had been sold or confiscated; they operate on all.

A partial legislation, prejudicial to British subjects, was the thing it was the object of the British government to provide against.

Did the British government intend to ask, or ours to give, privileges and immunities, or exemptions to British subjects that were not accorded to our own citizens?

The legislature might perhaps have adopted such violent measures in relation to confiscated estates, which would have been unjust to our own citizens and to British subjects; and against such acts the treaty was intended to guard. But it cannot be supposed that the provision of the treaty was to extend to interfere with regulations founded upon the principles of national justice.

What were " the just rights" of persons having an interest in confiscated lands? Not a right to the future labour of others, by which the value of the lands should be enhanced. In 1783, no British subject had a " just right" to the in-

creased value which James Carver should give to the lands after the year 1786, when the law was passed.

Mr Ogden, for the defendant in error.

In 1754, Mary Philipse was seised in fee of a part of what was then called " Philipse Upper Manor," of which the premises in dispute in this suit are a portion. Mary Philipse is therefore the source from which both parties derive title.

The plaintiff in the court below must show that he has a good title under Mary Philipse. He claims under a deed of marriage settlement, executed by Mary Philipse, in consideration of her intended marriage with Roger Morris.

Was this deed executed and delivered by Mary Philipse? This is a pure question of fact to be decided by a jury. The jury have found the fact; their verdict is conclusive, unless the judge of the circuit court has misdirected the jury in the law. If the misdirection of the judge was as to facts, it may have furnished ground for a new trial in the court below, but not for a reversal of the judgment here. 1 Serg. & Rawle, 333, 336. If no illegal evidence was admitted, the judgment is conclusive.

The proof of the execution of the deed, and of its delivery, was made by the deposition of Mr Livingston in 1787, and by proof of the hand writing of the witnesses who are dead. This is the ordinary proof on such matters; all the other proof was brought forward by the defendant, all of which was given to the jury. This evidence was not illegal.

If all the circumstances of this case are to be reviewed by this court, what are they? The proof of the deed had been made by Mr Livingston, after it had been before the legislature, and the claims of those under whom the plaintiff claims had become the subjects of inquiry.

It is objected that the deed was never heard of before the revolutionary war, and that it had never been produced until the interests of the parties required its production. Had the parties who now exhibit the claim on the defendant considered it as an inoperative instrument, they would have destroyed it, and have claimed from the crown a compensation for the land, as a part of the loss sustained by the war. But if

any conclusions can be drawn from these facts, they were properly for the jury. As to the fact, whether the deed had been seen before the war; it may have existed, and yet not appear to this court, as the case is before this court on a bill of exceptions.

As to the deed not having been recorded at the time of its execution, there was no law in force requiring that it should be put on record. There is no strength in the argument, that as the other muniments of title were on record, the fact that this deed is not found on record authorises the belief that it never existed as a valid conveyance. A patent is always recorded before it issues. The deed to lead to uses, in the proceedings to bar the entail, was a part of the common recovery. The deed of partition, which operated on lands twenty miles square, divided among three children, must have been recorded for the satisfaction of purchasers. But the settlement deed affected only the parties to it, and its recording was not called for.

Nor is it evidence that no such deed was in force, that, in the conveyances made by Roger Morris and wife, after its execution, this deed was not mentioned. This was of no consequence in transferring property to strangers. But if these facts are of any value, they were proper for the jury in determining on the question of delivery, or on the presumption of a reconveyance.

In the marriage settlement, a power to convey lands to the amount of three thousand pounds was reserved, and conveyances of one thousand one hundred and ninety-five pounds were made. This power was properly executed without reciting that it was derived from the settlement deed. As to the presumption of a reconveyance, it is argued that a possession of seventy years was inconsistent with the marriage deed. But this was not the fact. In the year 1787, the deed was proved before judge Hobart, and was then recorded; and the claims of the children of Roger and Mary Morris were soon after presented to the legislature of New York. It is a universal principle of law, that if possession be consistent with a deed, it shall be presumed to be under it. In this case the acts of Roger Morris and

wife in the sale of the land, in granting leases, were of this character, and should be so considered.

It is contended by the counsel for the plaintiff in error, that the recital of the lease in the settlement deed does not bind him, because, he does not hold under that deed ; and does not bind the state of New York, his grantor, because of its sovereign character.   In answer to the first, it may be said, that if the plaintiff is not bound by the recitals, yet they were evidence which went properly to the jury, and their verdict has affirmed them.  To the second, it is submitted, that although the king is not bound by recitals in his own deed, he is bound by those in deeds under which he claims.   Matthews, 201.   What was the legal operation of the deed ?   It was the conveyance of the estate to trustees for the use of Roger Morris and wife for life, remainder to their children, and if no children, a contingent remainder over to Mary Morris and her devisees.   The remainder to the children was at first contingent, which vested at the birth of each child, and opened to let in those who were born afterwards.   Cruise, Rem. ch. 5, p. 346, 264, 336, ch. 4, sec. 15, ch. 5, sec. 11, p. 350.

It is said that the remainders were destroyed by the operation of the acts of attainder and forfeiture, and the conveyance by the state of New York.   That these were equivalent to a feoffment, and destroyed the particular estate, and consequently the remainders.   But the conveyance of the state with warranty, was not equal to a feoffment.   There was no livery of seisin, and the operation of conveyances which pass the whole estate is confined to those with livery of seisin.

Nor was the attainder and banishment of Morris and wife a civil death.   The treaty of peace repealed the banishment, and thus restored them to civil existence.   The estate depended, by the terms of its grant, on the natural death of the grantors.

And the law is, that if a particular estate is determined the remainder man might enter, but he is not compelled to do so.   2 Ves. Sen. 482.   7 East, 32.   The act of attainder

intended to forfeit only the interest of Roger Morris and wife. Its terms extend no farther, and such only could be its operation. The offence charged against them was not treason, and no forfeiture was effected, but according to the words of the law. 2 Johns. Rep. 248. A condition or possibility was not forfeited. 4 Mason, 174. The act did not intend to terminate the estate of Roger Morris and wife, but to transfer it to the state of New York, and to continue it afterwards. Thus, for all purposes of sustaining the remainders, it did continue, and their estate being limited to their lives, is now fully determined by their death; and their children, under whom the plaintiff below claimed, were fully entitled to the land.

As to the claim to be paid for the improvements, the treaty of 1782 confirmed all unforfeited estates, and protected them from state legislation. The rights of those interested in lands were then vested, and could not be impaired. In 1782 the land held by the plaintiff in error was conveyed to him, and the acts of the legislature of New York, under which he claims to be paid for his improvements, were passed in 1784 and 1786. He did not buy the land on the faith of these acts; and he has no claim to their legal provisions, or to any equities under them.

Mr Wirt, also for the defendant in error, said; this case arises under the attainder and confiscation act of the state of New York. The confiscation having fallen on the estate of Roger Morris and Mary his wife, under which the property was sold, and the remainder in the children of Morris and wife having been, as is contended by the defendants in error, protected by the treaty of peace, was sold to John Jacob Astor, and is now claimed under that purchase.

As the state of New York had sold the estate, under the confiscating law, claiming the fee simple to be forfeited, it considered itself responsible to the purchasers, should their grantees be ousted, after the life estate acknowledged to have been in Morris and wife should terminate.

Under these circumstances Mr Astor thought it advisable to present his claim to the legislature of New York, and cer-

tain acts were passed, by force of which, should the title be established, by competent and designated judicial proceedings, to be in him, the state of New York has offered to pay him four hundred and fifty thousand dollars, on his executing a full and complete conveyance of the estate, both in law and equity; which sum is to be reduced to two hundred and fifty thousand dollars, if it shall be determined that he shall be liable to pay for the improvements made on the confiscated property, since the sale by the state.

The acts provide, that as a test of the real merits of Mr Astor's title, five suits in ejectment shall be prosecuted to judgment, and the decision of three actions out of the five shall be conclusive on all parties.

Under these acts the trial in question has been had, not under the general law of ejectment which prevails in the state, but under the special provisions made for the case, and deranging the general rules of evidence in some particulars. On this trial the verdict and judgment were in favour of Mr Astor; and the defendant has brought the case here by writ of error, upon which writ no questions are open for consideration, but errors in law committed on the trial. Whether the jury decided properly on the evidence is no question for this court. Such suggestions could only have been properly made on a motion for a new trial, or if the case were here on a demurrer to evidence.

The errors alleged to have been committed on the trial, may be divided into four classes :

1. Errors in the admission and rejection of evidence.

2. Errors in the construction of the deed of marriage settlement, and the operation of the act of attainder and confiscation.

3. Errors in the charge to the jury.

4. Errors in awarding the writ of possession, without requiring the plaintiff to pay for the improvements.

1. Errors in the admission and rejection of evidence. This was a prolific head    exceptions, and in order to estimate them correctly the court must advert to the precise point of the controversy at which they arose, and the situation of the parties to the suit.

In 1758, the marriage settlement, the purport of which has been frequently stated in argument, was executed between Roger Morris, Mary Philipse, and the trustees, Beverly Robinson and Joanna Philipse, the mother of Mary Philipse. The contingent remainder limited by the deed to the children in fee, became vested on their births; and all the children having been born before the year 1779, the condition of the property at that time was; that Morris and wife held an estate for life in it, with a remainder in fee to their children, which remainder continued in them until 1809, when they sold the same to Mr Astor.

The defendant claims under the act of attainder and confiscation of New York, passed on the 22d of October 1779. The estate forfeited by that act was all that which Roger and Mary Morris had on the day of its passage. This we say was a life estate merely as it regards the premises in this suit; leaving the remainder in fee in the children untouched.

How is this act to be construed? As a forfeiture for treason? If so, the forfeiture would have relation only to the time of the offence for avoiding all subsequent alienations of land. 2 Hawk. ch. 49, sec. 30. But the courts of New York have expressly decided it is not to be considered as imposing a forfeiture for treason; that the act was a specified offence, and not treason; and that the extent of the forfeiture is to be sought for only in the act itself. This court has held that state decisions on state laws are binding here.

The forfeiture is not therefore of the estate of Mary Morris as it came to her from her father, but as it was subject to all her conveyances of all or any part of it, and to any dispositions she may have made of it, up to the time of the enactment of the law.

If then the deed of 1758, under which we claim, was really executed, being a prior alienation, the title of the state and of her grantees is barred. Thus, both plaintiff and defendant claim under Mary Philipse, they are both privies to her and to her estate. The plaintiff below is a privy by deed, the defendant a privy by law.

[Carver *vs.* Jackson ex dem. Astor et al.]

Could the state, on the trial of the cause, have been considered as a stranger ? They claim the estate of Morris and wife. They took the estate they held in October 1779, and they were consequently bound by all their prior alienations.

The state are not indeed privies in blood, nor in deed, by voluntary alienation ; but they are privies in law, like the lord by escheat or forfeiture. They belong to the class of those who come in by act of law, or " in the post," as lord Coke terms it. Coke Lit. 352 (*a*). And thus, being privies in law, they are bound by the same rules of evidence, and by the same estoppels, as privies in blood, or privies in deed.

Mr Wirt then went into a particular examination of the decision of the court below on the admission of the deed of release in evidence. He contended, that on the proof of the deed by Mr Livingston, and on the evidence of Mr Hoffman and Mr Benson of the hand writing of the subscribing witnesses, they being dead, it was competent evidence. Cited, 1 Starkie, 333, 340, 341.

The defendant, he argued, did not question the sealing of the deed, but he did question its delivery, and he offered circumstances as evidence to lead to the presumption, that the deed, although solemnly prepared, had never been delivered.

All these circumstances were admitted in evidence by the plaintiff below, without objection ; none were excluded by the court ; and the defendant had the full benefit of them. They bore on a question of fact, the delivery of the deed ; and their effect belonged to the jury exclusively, who have found that the deed was delivered. These circumstances, and the effect of the testimony do not belong to the argument here. All that is to be inquired into is, whether the judge committed an error in law on this subject. No such error existed ; none will be found in the charge. The instructions of the court to the jury, left to them the decision of the value and weight of the evidence.

He contended, 1. That the recital of the deed was not only some evidence of the existence of the lease, but that in this case, it was an actual estoppel against the state of

New York to deny its existence. 2. That if it was not an estoppel, it was unquestionably evidence to the extent to which it was admitted.

If it was an estoppel, all questions which arise upon the exclusion of the auxiliary proof are superseded ; for it could not prejudice the defendant to have let in such proof to establish a fact which he was already estopped to deny.

It is assumed as a proposition, that the recital of a lease in a deed of release is evidence not only against the releasor, but against all who claim under him by subsequent title, whether they deduce their title through the deed or not. That such a recital is not only evidence, but is an estoppel which binds the releasor and all who take the estate in his right by subsequent title derived from him; and it is only against strangers in estate and blood, having no privity with the one who has made the recital, that the existence and loss of the recited instrument is required to be proved *aliunde.*

The distinction that the recital binds those only who claim the estate through the deed, cannot be sound ; because it is admitted that such a recital binds the heir, who does not claim through the deed, but through a line of descents, or of descents and devises, blended, without the necessity of calling to his aid any collateral deed made by any of his ancestors ; and yet he is bound not only by the deeds of his ancestors, but by all their recitals.

Why is he bound ? Because he takes the property under the ancestor, precisely as the ancestor held it, claiming it in right of his ancestor; and is therefore bound by every admission under seal which would bind that ancestor. This is precisely the case with the state of New York. She took the estate under the same principles, and bound by the same admissions, not as a privy in blood, but by privity of law; which it will be shown is the same in effect according to the doctrine of estoppels.

The state of New York is not an alienee for a valuable consideration, she stands in a situation resembling rather that of the heir, than that of such an alienee. The estate of the ancestor descends on the heir by the general law of the land; this estate vests in the state under a particular law.

[Carver *vs.* Jackson ex dem. Astor et al.]

In both instances it vests in the same character, and in the same right; in the precise situation in which it was held by the person last seised.

The authorities maintain the principles and the positions here assumed. Gilbert's Ev. by Lofft, 101. 1 Phil. Ev. 355. 1 Saunders on Pleading and Evidence, 42. Peake, 164. 1 Stark. 369. 6 Mod. 44. 1 Salk. 285. 2 Levinz, 108, 242. Vaughan, 74. 4 Binney, 231. Penrose *vs.* Griffith, 6 Binney, 416.

The principles settled by those cases are, that recitals bind the party and all who claim under him by subsequent conveyances, but not those who claim under him by conveyance prior to the reciting deed. The operation of the recitals is not confined to those who claim under the specific deed of recital, but extends to all who claim by subsequent title.

Now the plaintiff in error is just in this predicament, for he claims under the same grantor by title derived subsequently to the date of the reciting deed. He claims under those who themselves claim under that deed; he claims the very interest which the deed moulds and limits, and therefore may be said to claim under the deed.

But while none of the cases which have been cited recognize this distinction, there are others which seem to put an end to it entirely. Marchioness of Annandale *vs.* Harris, 2 P. Wms, 432. Doe ex dem. of Colden *vs.* Cornell, 3 Johns. Cases, 174.

We are told by Lord Coke, Co. Lit. 352, that recitals are reciprocal. Such too is the law of New York. Lansing *vs.* Montgomery, 2 Johns. Rep. 382. And therefore, since the state can estop the heir by such a recital, the state shall herself be estopped by a similar recital. Suppose that the deed of release had settled the estate on Roger Morris in fee, and that the act of attainder and forfeiture had fallen on his person alone? Can there be a doubt that the purchaser under the state would have defended himself under the lease, and that the wife and children would have been estopped from denying its existence. The decision in Denn *vs.* Cornell establishes this. 3 Johns. Cases, 174.

But if the release is not an estoppel, the judge in the

court below did not err; for he did not admit it as an estoppel, but only as some evidence of the existence of the lease. Was he wrong in this? The cases which have been cited to prove it an estoppel, do at least establish that it is evidence; that is, some evidence against the parties, and all who claim under them. Matthews on Presumptive Proof, 201. See also Garwood et al. vs. Dennis, 4 Binn. 314. 3 Preston on Estates, 28, 29, 30, 31.

If the court were not to regard the recital as some evidence that a lease had been executed, what was to be done with the release which had been proved, and was regularly in evidence. Could they regard it as a simple bargain and sale, vesting the whole legal estate in the trustees, and leaving equitable estates only in Roger Morris and wife, and in their children? The instrument disavowed that character for itself. It declared itself to be a deed founded on a lease; and its design to be, to transfer the uses into possession, under the statute of uses. The instrument being in the cause could not be got out of it, and the recital is part of it. The court were to give its legal character to the instrument, and on the truth of the recital its legal character depended: was not the recital enough to justify the court in saying, it appears there was a lease; you must produce the lease or account for its non-production? If the court could have said this, it is enough to justify the opinion which was expressed; for such was simply the effect of the opinion which was expressed.

Upon the alleged errors in the legal construction of the deed of marriage settlement, and the operation of the act of confiscation and attainder; Mr Wirt observed that the first point in which error is stated to have existed, was in holding, that under the marriage settlement there was a vested remainder in the children, on the 22d of October 1779, the date of the act of confiscation. The children were all born before 1779, and the remainder vested on their birth.

The question is, as to the legal effect of the limitation to the children? The construction of the circuit court, which we support, is 1. That the remainder in fee limited to the children was contingent until the birth of the first child.

2. That on the birth of the first child the whole remainder vested in fee.

3. That on the birth of the second child the remainder vested in the first opened to receive him, and so on until all the children were born, when it became a vested remainder in the whole.

On the other side, the position is, that the remainder did not vest on the birth of the children; but continued to be a contingent remainder, until it should be seen whether the children would survive the mother; because the enjoyment of the estate depended on that contingency, for if the mother should survive she took the remainder.

We apprehend that the counsel for the plaintiffs has not sufficiently adverted to the distinction between the contingency on which a remainder is to vest in interest, and that on which it is to vest in possession. Vested remainders are still contingent as to the enjoyment during the continuance of the particular estate; and by the death of a remainderman for life, before the determination of the particular estate, the vested remainder is gone for ever; it is divested on this event, and goes over to the ulterior remainderman. During the life of the remainderman, however, it continued to be a vested remainder; for it was vested in interest, however uncertain the enjoyment.

The distinction between a vested and a contingent remainder does not depend on the contingency on which it is to vest in possession, but on that on which it is to vest in interest. The question, and the only question is this,—is the remainderman in esse, and capable of taking, if the life estate should determine? If he be, the remainder is at once a vested remainder, though it may be uncertain whether it will ever vest in enjoyment. Fearne, 215, 216.

Now the children of Roger Morris and wife were in esse before the year 1779, and were capable of taking in possession, if the possession had become vacant by the death of the tenant for life. They had therefore a vested estate.

As to the objection that they were not capable of taking the possession during the life of their parents. This is confounding the capability to take the possession, with the right

to take it. In any vested remainder the capacity to take the possession arises before the right to take it. That capacity exists as soon as there is a person in esse who meets the description of the remainderman, and nothing is interposed between him and the possession except the particular estate, while the right to take it is yet in suspense until the determination of the particular estate. And as soon as a remainderman is presented who meets the description of the limitation, and between whom and the possession nothing stands but the particular estate, the remainder vests in interest, though it may chance never to come into possession; for many are the vested remainders which have passed away, without having vested in possession.

On the 1st of October 1779, there was a life estate in the parents; there were children of the marriage, remaindermen, all in esse, and nothing interposed between them and the possession except the particular estate; and had that particular estate ended on the 1st of October 1779, they had capacity to take, and most certainly would have taken. These principles are fully sustained in Fearne on Remainders, 215, 216, and the cases cited by the counsel for the plaintiff in error do not impugn them.

The question depends on the very terms in which the remainder is limited. The remainder limited over has nothing to do with the vesting of the first remainder, though it may have something do with the enjoyment of the estate. In this case the limitation is not to such of the children as may be living at the death of their parents. Such a limitation might have altered the rights of the parties; as it would have remained uncertain until the death of the parents, who would be, and whether there would ever be a remainderman.

It is not, however, a life estate which is given to the children, but an estate in fee simple. Now, upon the construction given on the other side, which considers the lives of the children as running against the life of the mother, both contingent until her death, and the survivor to take the estate,—suppose the children to have died before the mother, leaving children; was it the intention of the settlement that they should be disinherited?

By no construction can this be made an estate tail by implication; but if it could, it would not vary or affect the vesting of the estate, subject to their dying without issue in the life of the mother.

The authorities to show that an estate is not prevented from vesting in interest, though the possession may be subject to be defeated by future contingencies, are Doe vs. Perryne, 3 T. R. 484. 4 T. R. 39. 4 Bos. & Pul. 313. 1 Maule & Selwyn, 321. 6 Price's Rep. 41.

It has been said for the plaintiff in error, that these were concurrent, contingent remainders, and that both were contingent until the survivor who was to enjoy the estate was ascertained. This is the same position in effect with that to which an answer has been given. They are not concurrent but successive remainders; the first remainder is to the children, and failing the vesting of that, the limitation to the mother would survive and vest.

Courts never consider remainders concurrent contingencies, except from absolute necessity. Fearne, 377. But if they were concurrent, they remained so only until the birth of a child of the marriage, and then the remainder fully vested in such child. Luddington vs. Kime, 1 Lord Ray. 203.

The next supposed error is in the construction of the acts of attainder and confiscation; and on the assumption that this is a vested remainder, it is not understood to be contended that the act of confiscation would affect it.

Errors in the charge to the jury.—No important errors in law in the charge have been insisted on, but such as have already been the subject of comment. The residue of the objections are, that the judge, in summing up the facts, put the evidence to the jury too favourably for the plaintiff below, and did not put it sufficiently strong for the defendant.

Are the judge's remarks upon the evidence errors in law? There is no case which supports such a position; on the contrary it is expressly laid down, that they are not such errors. 1 Serg. & Rawle, 333. Resting upon this authority, the charge may be left to its own vindication, not doubting that that vindication will be ample and sufficient for it.

As to the question of improvements.

The case is this. There are remainders in fee protected by the treaty of 1783; and the state of New York has seized and sold the life estate, declaring by acts subsequent to the treaty, that with respect to all improvements made by the tenant for life, the remainderman shall not have his estate until he shall have paid for those improvements.

1. Is this consistent with the nature of the estate?

2. Are these acts compatible with the treaty?

As to the first inquiry, Roger Morris and wife were tenants for life, the remainder in fee belonging to their children. The relative rights of the parties were fixed by the deed of marriage settlement.

Under this deed could Morris and his wife charge the remainderman in fee, with any improvements they should put on the land? Suppose, after having improved the lands, by their last will and testament they had directed that the remaindermen should not enter until they paid for the improvements? Would such a will have operated against their children? Suppose they had sold their estate for life, stipulating that the purchasers, before the property should be taken from them after their decease by the remainderman, should be paid for all buildings and improvements made on the land. Would such a covenant have operated on the children? Under the deed of settlement no power thus to charge the fee was reserved. When therefore the state of New York took the estate of Morris and wife, they held it as it had been held, and they succeeded to them as tenants for life, with no other powers over the estate than they had. Unless this was so, they took a greater estate than was held by them.

But the act of confiscation disclaims this. It purports to take the estate of Morris and wife only, and as they held it on the 22d of October 1779. The act does not purport or profess to disturb or impair any estate, except the estates of persons named in it.

The state of New York could not, by mere right of succession to the state of Morris and wife, impose this burthen

[Carver *vs.* Jackson ex dem. Astor et al.]

on the remaindermen, and impair their rights. It would be a most unjust and palpable violation of the rights of property, a usurpation of power altogether unwarranted by the nature of the estate which they had taken under the law. Nor does the power thus to charge the estate of the remainderman result from their general power of legislation. It was not a general act, which declared that all remaindermen should pay for improvements. It was confined to estates confiscated by the act of 1779. It was in effect a declaration by the tenant for life, that the remainderman should not have his estate until he paid him for his improvements. It thus became an individual action, and was not a legislative action.

But if it was a legislative action, its effect was an enlargement of the confiscation act of 1779. It was a new confiscation, pro tanto, imposed on these remaindermen.

Who is to receive the value of these improvements? The acts of the state of New York show they are to be paid for by them; the value is to be deducted from the sum payable to Mr Astor, and thus the amount is to go into the fisc of the state. This is a confiscation of the estates of children for the offences of their fathers.

2. Let us turn to the treaty of 1783, and consider the question under that treaty.

The court will perceive that the act of 1784 has nothing to do with this case. That act was prospective, and the sale to Carver was made in 1782. It is the act of May 1786 which alone can effect this case; and by the suggestion it appears that the claim is for improvements made since that act. Such a claim is in direct opposition to the fifth article of the treaty of peace. The terms of the article are : "and it is agreed, that all persons who have any interest in confiscated lands, either by will, marriage settlement, or otherwise, shall meet with no lawful impediment in the prosecution of their just rights."

Persons claiming an interest in lands by marriage settlement, are one of the classes put by the treaty ; and their "just rights" are the rights they had when the treaty was made. These rights were fixed at the time of the treaty, by

Vol. IV.—I

[Carver *vs.* Jackson ex dem. Astor et al.]

the marriage settlements, and they were to enter on their estates on the death of the tenants for life, without any responsibility for the improvements placed upon them during the tenancy.

But here is a law of New York, passed three years after the treaty, which declares that they shall not enter on their estates without paying the full value of those improvements. Is not this an " impediment" raised by this law to the prosecution of their just rights, and consequently a violation of the treaty ?

It is said to be no impediment to the prosecution of their just rights, because it is just that they should pay for the improvements. This resolves itself into a question of law; which is, whether the remainderman in fee cannot *justly* take possession of the estate when his title to the possession commences, without paying for improvements put on the land by the holder of the intermediate estate. This is no question to a legal mind.

In relation to the equitable view of the question ; this is not the case of a party who, having a right to the present possession, has stood by and seen valuable improvements put upon the estate without disclosing his title, for the children had no title to the possession until the death of their mother.

Nor is there any thing in the argument that these improvements were made in ignorance of their title. Where is the law which requires that a party thus situated shall disclose his title ? It may also be urged, that the acts of the legislature of New York bear upon their face evidence of a general knowledge that there were outstanding titles, which might lead to the eviction of their purchasers ; and that they are on their face levelled against the very titles which stand protected by the treaty.

Mr Webster, for the plaintiff in error.

The first inquiry in the case was, as to the manner in which the verdict was obtained. Was it regularly proved that any conveyance was ever completed, by which Mary Morris parted with her fee in the land, and which was existing as a

valid conveyance in October 1779 ?   We say it was not: be-
cause, we say, the judge misdirected the jury on the evidence
bearing upon that point.

We say a judge may commit errors which this court may
correct; either, 1. In admitting evidence which ought not
to have been admitted.   2. In rejecting what ought to have
been admitted.   3. By misstating the effect, not the weight
of evidence.   4. By misleading the jury by a wrong state-
ment to them of what the evidence really is.

The two first propositions no one will deny.   Tayloe *vs.*
Riggs, 1 Peters, 183, 596.   Chirac *vs.* Reinecker, 2 Peters,
625.   Dunlap *vs.* Patterson, 5 Cowen, 243.

The weight of evidence is for the jury.   If a judge hap-
pens to say that he thinks A. more credible than B. it is a re-
mark on evidence.   If he says that it strikes him as not proved
that a bond was given, it is the same ; not so, if he speaks of
the tendency or effect of evidence.   If he says ; this evidence,
if believed, tends to establish the party's right when it does
not ; or that it does not when it does ; then it is error ; be-
cause, it is a remark not on evidence, but on the law of evi-
dence.   So if he misstates the thing to be proved, or the
object for which it is intended, or its legal bearing ; this is
error.

With these general principles in view, we mean to exa-
mine the judge's ruling on the trial in the circuit court.

1. As to the evidence of the question of the lease.  Noth-
ing was proved but by the testimony of governor Livingston
and Mr Hoffman.   This was all merely formal.   Governor
Livingston's oath was in the very words of the attestation,
and no more ; it was written for him beforehand, and in the
formal words of attesting an instrument.   He was an old man,
swearing to a transaction then thirty years old ; and there was
no proof, no circumstance of which he had any recollection,
but from seeing his signature.   There was no more in this
than in all other certificates of attestation ; they usually cer-
tify delivery before any actual delivery is made, and this
was the fact in one of the conveyances by Mr Astor in this
case.

The deed was doubtless executed at the house of Mrs

Philipse. All this is no more than proving his own hand. writing in 1787; and this would have answered the same purpose.    All that was proved in this case was merely formal; it is just what would have been done if the parties had intended only to have a deed prepared, to be delivered or not, as they should afterwards decide, as an escrow. It is certain he did not see any actual delivery of the deed; and, while nothing is imputed to governor Livingston, his testimony goes no further than has been stated.

There was no other proof of the existence of this paper, until it was proved in April 1787.  It is not traced to the hands of the grantees. No. one ever saw it; it was not shown to the legislature. Perhaps, on this evidence, and its effects, the judge did not misdirect the jury.

This, though perhaps prima facie proof, was the slightest of all proof. No actual delivery shown, no possession of the deed by the grantees. Now suppose a marriage had not taken place, and the trustees had set up this deed; it would have been said at once that the presumption of delivery was overruled. Any thing else that carries an equal presumption destroys the prima facie proof. It is, of all cases, the one in which subsequent events might intercept the delivery of the deed:

We were not called upon to disprove delivery; it was enough for us to bring the fact of delivery into doubt, every thing else without delivery was nothing. The judge in this matter was right.

Now, what did we offer against this evidence. 1. The deed was never recorded or proved: this was not required by law, but it was, usual, especially with this family; all their deeds were recorded; the first patent, the deed to lead to uses, the deed of partition; and the will was proved in chancery.

The settlement deed of all others was a proper deed to be recorded; it was to provide for unborn children, and the practice of the family was not to be changed. The trustees would, in accordance with their duty, prove and record this deed, to preserve the rights of the children.

More especially, why was not this deed proved and re-

corded in 1783. Forfeitures were then all over; the children were born, and perhaps of men's estate. Only one part was found, and that had been carried beyond seas. Would prudent men have so acted. The treaty had then established the children's rights.

Now we say that this part of the case was not accurately stated to the jury. The judge asks if these circumstances should operate against the children? we say they should; and we think here is a plain misdirection in point of law.

We say that all the evidence relied upon by us, drawn from the conduct of the immediate parties to the supposed deed, is evidence against the children. The judge says these facts should not operate against the children; we contend that they should and must; and this is a direct question of law, not a mere remark on evidence.

Again, the judge excuses Morris from recording the deed, because he says there were at that time no offices for recording deeds. But this could only be from 1775 to 1783. Our argument is, that if the deed had ever been delivered, it would have been recorded before 1775. Is the form of this argument fairly stated? Is it legally stated? Then again, as to not recording in 1783; the judge asks, are there not circumstances to account for this delay of three or four years. This is equivalent to saying that there are such circumstances.

2. The sleeping of this settlement from 1758 to 1787, twenty-nine years, is relied upon to prove that it never had a legal existence. No witness ever saw it. It was not heard of by any of the family. It is recited in none of the conveyances. These are material facts. In the history of this title each deed recites the previous deed, down to that now under examination; below it they recite not through it, but over it; or as if it were not in existence. There is an absolute absence of every possible fact looking to or recognising the existence of this deed for thirty years.

Now is not this of itself evidence of weight and importance to rebut the presumption of delivery?

How does the judge answer this? He says there would

have been weight in this if the children had slept thus long: we say it is just as strong against them, for the purpose for which we use it, as against Morris and wife, and the trustees. "The children slept upon their rights:" the very question is whether the children had any rights. It is not whether they shall be barred, but whether they ever had any estate. Now this is clear matter of law. " Is it fair to draw any inference in such a case against the children ?" That is, the jury understood the judge to say ; the law will warrant no such inference. We say it will.

3. The manner of holding the property, and acts inconsistent with the title under the deed, disprove its existence.

Here is a whole series of acts extending over many years, by the very persons who were parties to the supposed settlement, and absolutely irreconcilable to the idea of its real subsistence. These were the conveyances executed by Roger Morris and wife, in which the settlement was not mentioned, and conveyances made in direct disaffirmance of it. The charge of the judge upon these matters was altogether erroneous.

The deeds thus executed, and the agreements, indicate a holding of the property in fee simple, not a holding under the settlement. And the judge says; that they are within the limitation of the power reserved in the settlement deed, and not inconsistent with it.

Is this so ? By the settlement deed, Morris and wife had estates for life only: in the deeds they expressly covenant they are seised in fee. Now the consistency or inconsistency of these deeds is a question of law, though the effect of the inconsistency is a question for the jury. The judge has said that in point of law they are consistent deeds, that there is no inconsistency between the covenants in the deed and the title under the settlement. Is this correct?

If the judge had said that this form of executing the powers, might have been used through mistake ; that the deeds might have been inartificially drawn; and that the jury might consider those circumstances ; it had been well enough. But he withdraws the whole matter at once from

[Carver vs. Jackson ex dem. Astor et al.]

the consideration of the jury, by directing them, as matter of law, that there is no inconsistency. Can this be sustained?

As to the life leases, they were not given under the power reserved in the settlement deed, nor in execution of the power. They are totally inconsistent with it, and the evidence shows a system of leasing the lands. How does the judge dispose of these? It was a question of intention as we say; and the judge asks; how do these facts affect the rights of the children? This is equivalent to saying they do not affect the rights of the children at all, in point of law. This is a legal direction on the effect of evidence. Is it right? might not these acts affect the children?

Again, the judge says, did Morris intend these acts in hostility to the children? that is not the true question. The question is, whether these acts go to show that there were no rights in the children. The truth is, the judge proceeded altogether on the supposition that there had been an original acknowledged right in the children; and that we were attempting to bar that right by adverse possession. We say these acts prove or tend to prove that there was no subsisting settlement, and that not only the weight but the bearing and effect of this evidence was misstated to the jury.

We contend that every thing from 1758 to the revolution, bearing either way, bears against the settlement deed, as a subsisting deed, and for the original title; every thing giving indications either way, indicates a holding under the original title. That in thirty years there was no act to the contrary. We do not say these circumstances are conclusive as matters of law, but we say they are cogent as matters of evidence; and we say the judge substantially withdrew the consideration of them from the jury.

On the other important fact that the deed came, in 1787, from the hands of the grantor, the judge said nothing. He omitted to notice the circumstance, although he stated that he had mentioned all the circumstances of the case.

Then the case is: 1. That the deed, thirty years after its date, is still found in the hands of the grantor, not proved,

acknowledged or recorded.  2. That no other part of the indenture is produced, lease or release, though search has been made for it.  3. That no one ever saw the deed from its date until 1787.  4. That no one act was done in thirty years, recognising the existence of the deed for thirty years.  5. That subsequent conveyances, deducing the whole title, and reciting every other conveyance in the chain, make no mention of any such settlement deed.  6. That there is a series of acts, deeds, conveyances and compacts, beginning within five days of the date of the supposed settlement, and coming down to the revolution by parties to the supposed deed, wholly inconsistent with any idea of its subsistence.

Now we admit that a jury may set up the settlement deed against all this evidence; provided no direction be given them after the evidence is put in, and provided no improper direction be given.  We do not ask the court to decide on the weight of evidence.  But we say, if the judge misstates the object of the evidence offered, if he misdirects as to its tendency and effects, if he states incorrectly the views in which it is evidence; then the jury has been prevented from passing intelligently on the matter.  We say the directions of the judge on these facts were not according to the law of the case.

It is also contended that the acts of the legislature of New York were not evidence in the cause.  The effect of their introduction was to change the parties before the jury.  They were not general laws of the land; and they were important testimony.  For the admission of such evidence a court will reverse a judgment.  3 Cow. 621.  16 Johns. 89.  5 Cow. 243.

As to the recital of the lease in the deed of release; how far does it bind the plaintiff in error, and the state of New York, under which he claims?

It is admitted that recitals estop the party to the deed, himself and his heirs; because the heir is bound by the covenants of his ancestor.  They also affect every person claiming under the instrument, unless it was offered as presumptive evidence of a grant in order to support a possession which

could not be accounted for but on the supposition of such grant. These principles are fully sustained by the elementary writers, and by the cases in 1 Salk. 285, 286. Ford vs. Grey, 6 Mod. 44. 4 Binney, 355. Norris's Peake, 164. Archbold's Pleading, 380. Saunders on Pleading and Proof. Preston on Estates, 43. Phil. Ev. 410. 1 Salk. 276.

There is no case in which a recital has been held to bind a person who comes in, in invitum. The alienee may be protected by covenants. But suppose a creditor who has the land in execution; he takes it bound by every thing his debtor has done, not by every thing his debtor has said. It operates by way of admission. Under what circumstances is one man bound by the admissions of another. Suppose an admission under hand and seal, that the property is held fraudulently. This will not bind the alienee without notice.

In the case in 1 Salk. 285, Ford vs. Grey, what is meant by " those claiming under him ?" Is it the persons who claim under the same conveyance, or merely by subsequent deed? The court had just decided that admissions in an answer in chancery bind the party, but not his alienee. If the court designed these words in their extended sense, they would have suggested the distinction between an answer and a deed.

The state of New York is a stranger to the deed of Morris and wife, and the recital should not, upon sound principles of law, have been admitted to prove the existence of the lease. But the circuit court admitted the recital to prove the existence of the lease, and also its contents. Upon the cases decided in Pennsylvania, in 4 Binney, 614, and another, the possession was equivocal, and secondary evidence was called in aid. Those decisions turned on the special circumstances of the case. The case in 17 Ves. 134, was a case in which the lease was to be proved. Counsel were employed to examine the papers before the conveyance. The chancellor admitted the release, because the possession could not be accounted for on any other ground. If possession is equivocal, the exigency under which this case would apply has not arisen.

In Buller's Nisi Prius, 254, it is said, " when possession

has gone along with the deed many years, the original of which is lost or destroyed, a copy or abstract may be given in evidence." In Matthews the doctrine is fully set forth, 188, 189, 190. And in the authorities cited, it is distinctly stated that the recital of a lease in the release is evidence in those cases where auxiliary proof is admitted to make out the presumption of a conveyance to support a possession. Now if the possession is equivocal, ex natura rerum, the presumption can never arise. Ricard *vs.* Williams, 7 Wheat. 59.

In the case before the court the possession, so far as the acts of the parties to the alleged settlement deed are to give it a character, has been shown to be adverse to the terms and purposes of that deed, and not at any time such as could have existed had the deed been considered operative and in force. When therefore the parties did not by their acts give to the deed any influence, ought it to operate on those who were entirely strangers to it, and who rely on the acts and proceedings of the parties to the deed to prove it had not a valid existence. This is to give it effect and power over the rights of strangers, when these were never permitted by the parties to prevail as to themselves.

Upon the title acquired by the children of Roger Morris, under the deed of settlement, Mr Webster argued ;

The question upon this title is now for the first time to be discussed. The construction which this court will give to that deed may be in favour of Mr Astor, and carry the rule as to contingent remainders to the extent claimed by his counsel ; but there has been no case referred to which sustains the doctrine.

In all the definitions and general doctrines of remainders, the counsel for both parties agree. A remainder is " a remnant of an estate, expectant on a particular estate, created together with it, at one time." A contingent remainder is a " remainder limited so as to depend on an event or condition which may never happen or be performed, or which may not happen or be performed until after the determination of the preceding estate."

These contingent remainders are classified under four divisions ;—and the fourth class is, where the contingency

consists in the person not being ascertained, or not in being, at the time the limitation was made.

The remainder now in question is of this class. Unquestionably when created it was contingent, because it was uncertain who would take. The example put by Fearne illustrates our case, as is contended. " If an estate be limited to two for life, remainder to the survivors in fee; the remainder is contingent, for it is uncertain who will be the survivor." Fearne on Rem. 9. And this case cannot range with the principles claimed for the defendant in error.

Now it being clear that this remainder being, at the time of its creation, contingent, because the persons to take were not ascertained; the question is, did it vest on the birth of a child of Roger Morris and wife, or remain contingent until the determination of the particular estate ? We maintain the latter proposition.

Our view of the question is this. The deed created an estate for life in Morris and wife, with a remainder (not remainders), with an alternative aspect; or; in other words, to be disposed of, or go in one or other of the two ways, according to the events. We think the case precisely the same as if the words had been " an estate to Morris and wife for life, and to the children of the marriage in fee, if the parents should die leaving children; otherwise to the right heirs of Mary Morris."

It has been argued, that the object in giving a fee to the children was a high and leading one—that this was the first purpose, and all others were secondary. But the deed will bear no such construction.

It must be observed that the estate to be secured was the estate of Mary Morris. The object of the settlement was not to divest it, but to keep it in her control, and in the line of descent of her own right heirs. In only two events is it to be divested from her own right heirs. 1. If she have children living, it is to go to them, who, though her heirs, would take as purchasers. 2. The right to dispose of the estate by will in case of her dying without issue, and give away the estate to whom she pleased.

If she neither left children nor made a will, the estate

would go to her own right heirs.  In no event was it to be divested from her right heirs to the heirs of Morris, unless she should desire to have it so; and thus the true object of the settlement was no more than to point out two events, in either of which the transmission of the estate to her right heirs should be intercepted.   To use popular language, the estate is not vested in the children by the deed; it is to be settled on them, if there should be children surviving the parents.

The estate is to move from the line of legal transmission, before it can be vested in the children as *purchasers,* and the removal is to take place on the happening of the contingency: this contingency we say is nothing other than the living of the children at their parents' death, or their surviving their mother.

Suppose the grant had been from a stranger to Morris and wife for life; and after their death to their children if living; or otherwise, to the right heirs of the wife.   Would not this have been a clear case of survivorship?  It is stronger in this case, where Mary Philipse is the grantor, and proposes not to dispossess herself, nor her own right heirs; except in the happening of certain conditions and contingencies.

Now we say that there is no intent or purpose manifested by this deed, which is not capable of being carried into full effect according to its nature and import as a regular remainder. It comes, as has been said, within the regular definition of a remainder; and of a contingent remainder of the fourth class.   Cited, Preston on Estates, 119, 92, 93, 71, to show that it is a contingent remainder in Mr Fearne's fourth class.

It is not pretended that the limitation could not take effect as a remainder.

For the rule of law is universal and unbending.  "If a limitation can take effect as a remainder, it shall not be construed to take effect under the doctrine of shifting uses." 2 Cruise, 350. The doctrine of shifting cases is analogous to that of executory-devises.  "If there be a freehold to support the remainder, it shall not be construed an executory devise." Doe *vs.* Holmes, 3 Wilson, 243.  Luddington *vs.* Kime, 1

Lord Raymond, 203. 2 Cruise, 283. Douglass, 757. In Douglass, 225, Lord Mansfield says, " it is perfectly clear and settled, that when an estate can take effect as a remainder, it shall not be construed to be an executory devise or shifting use." This principle precisely meets the case of the plaintiff in error. The same point is settled, 3 T. R. 485. 2 Cruise, 285.

The counsel for the defendant in error insist that this is a vested remainder at the birth of the first child of Morris and wife; and that we do not attend to the distinction between remainders vesting in interest, and vesting in enjoymen. We have endeavoured to pay a due regard to this distinction.

A remainder vests in interest whenever the person is ascertained, and is in esse, and has a *fixed* right of future enjoyment. In the authority cited by the counsel, Fearne, 215, the remainder is absolutely limited to a person in essé. Now in the case before the court, it was not absolutely settled that the children would take: it could not on the view we have taken of the deed of settlement be absolutely ascertained until the parents' death.

Is is said, here is a person in esse, ascertained, and capable to take if the particular estate falls; and it is therefore a vested remainder. But the fallacy of this position is in this. He is capable of taking, that is, he is the person who may take, but he is not capable of taking, because he is not in a condition to take. Mrs Morris had just as much capacity to take as the children. But who shall take, is not ascertained. No one has a fixed and absolute right, nor can this be the case until the death of Mrs Morris. The facts of the case fully exemplify the application of these principles. Mrs Morris was married, had children, and had a brother who would be her heir at law, should she die leaving no children. Now if she should have survived her children, her brother would take the estate. Is this not a case of mere survivorship. Preston, 7. Croke Eliz. 630. Denn vs. Bagshaw, 4 D. & E. 512. 4 Johns. 61.

We say that as this remainder was capable of taking place as a regular remainder, it cannot take effect by way of shifting use. The law is fixed upon this point; there is no prin-

ciple which would induce the court to give it a construction to operate as a shifting use.

The operation of such a view of the case will show that it cannot be adopted. A son is born: we say the estate cannot be vested, because it is not ascertained that he will have it. If it does vest, it may defeat the whole purpose of the settlement. The counsel for the defendants in error say it shall vest; and if events make it necessary, we will divest it by the doctrine of shifting uses.

What will be the consequences of such a principle? On the birth of a son the remainder vests; he dies within a few hours after his birth: where is the estate then? It cannot go back to its original situation—once vested, it is no longer a contingent remainder. It has gone to his paternal uncle, out of the family. Suppose another child born, how can it go back? It never can by shifting use; for there can be no conveyance by shifting use, which conveyance is not provided in the deed. There is no provision in the deed that if the estate has been once vested in the right heirs of the children, it shall afterwards be divested. When the estate has once gone to the right heirs of the children, it is irrevocable—the whole force of the deed is spent.

Besides, the result would be, that to preserve the fee, to keep it safe, it should be transmitted to the Morris family, and be subject to forfeiture.

If the remainder was contingent, it fell on the attainder and banishment of Roger Morris and wife. This is the clear doctrine of law. Barland's case was like it. That was pronounced an escheat, and there was no attainder, no banishment. If a scintilla of the estate was left in the trustees, that passed by the act of attainder and banishment also.

Upon the claim of the plaintiff in error to be paid for his improvements, he argued, that it was questionable whether the terms of the treaty were intended to apply to such a case. This action is not brought to prosecute an interest in lands, by debt or marriage settlement; but for the mere lands themselves, to which an absolute title is created by a marriage settlement. The interest meant by the treaty was a lien on lands, not the lands themselves. This is apparent from an

examination of the terms of the treaty. Marriage settlements
are coupled with debts; and an interest in lands by debt can
only be a lien; and an interest in lands by marriage settle-
ment, when found in this connexion, can only mean a charge
on land by settlement deed.

It is to be observed that the treaty provides for any inte-
rest in land, whether by debt, marriage settlement, or *other-
wise.* Now, if this means a claim to the land itself, these
things would follow:

1. Suppose the children had been put into the act of at-
tainder, they could have pleaded the treaty, because they had
an interest in the land; that is, a title to the land itself,
under the marriage settlement. This was their "just right,"
and the confiscation act would have been an impediment.
2. Morris and wife might have sued in their life time, for they
had an interest in the land under a marriage settlement. 3.
The comprehensive term "or otherwise," would have let in
every body named in the act. This would have repealed
all the confiscation acts at once; which the treaty did not
do. It only recommended their repeal. There is nothing
to operate against the statute but the treaty.

He contended that the treaty did not apply to this case.
Its application could not interfere with the rights of those
who had improved the property and added to its value; so
that when it was recovered, the party who recovered, ob-
tained more than his title originally gave him. The treaty
protects the just rights of those who are included in its pro-
visions; but the party who has recovered the land cannot say
he has a just right to the improvements made on the land—
not made by an intruder, but by a purchaser of a title which
was good during the life of Morris and wife. The laws of
New York relative to this subject, would be in force against
her own citizens; and it could not have been intended that
British subjects should have rights and privileges greater
than our own citizens. The law interposes no impediment
to the recovery of the property the grantee of the children
of Morris and wife are really entitled to; it allows them to
recover the land in the situation it was at the time of the

settlement, and as it was, if Morris and wife had died a natural, instead of a civil death, in 1779.

. Mr Justice Story delivered the opinion of the Court.

This is a writ of error to the circuit court of the southern district of New York, in a case where the plaintiff in error was the original defendant. The action is ejectment, brought upon several demises; and among others, upon the demise of John Jacob Astor. The cause was tried upon the general issue, and a verdict rendered for the original plaintiff, upon which judgment was entered in his favour; and the present writ of error is brought to revise that judgment.

Both parties claim under Mary Philipse, who, it is admitted, was seised of the premises in fee in January 1758. Some of the counts in the declaration are founded upon demises made by the children of Mary Philipse, by her marriage with Roger Morris; and one of whom is upon the demise of John Jacob Astor, who claims as a grantee of the children.

Various exceptions were taken by the original defendant at the trial, to the ruling of the court upon matters of evidence, as well as upon certain other points of law growing out of the titles set up by the parties. The charge of the court in summing up the case to the jury, is also spread, in extenso, upon the record; and a general exception was taken to each and every part of the same, on behalf of the original defendant. And upon all these exceptions the case is now before us.

We take this occasion to express our decided disapprobation of the practice, (which seems of late to have gained ground,) of bringing the charge of the court below, at length, before this court for review. It is an unauthorised practice, and extremely inconvenient both to the inferior and to the appellate court. With the charge of the court to the jury, upon mere matters of fact, and with its commentaries upon the weight of evidence, this court has nothing to do. Observations of that nature are understood to be addressed to the jury, merely for their consideration, as the ultimate judges of matters of fact; and are entitled to no more weight or importance, than the jury in the exercise of their own

judgment choose to give them. They neither are, nor are they understood to be, binding upon them, as the true and conclusive exposition of the evidence(*a*). If, indeed, in the summing up, the court should mistake the law, that would justly furnish a ground for an exception. But the exception should be strictly confined to that mistatement; and by being made known at the moment, would often enable the court to correct an erroneous expression, or to explain or qualify it, in such a manner as to make it wholly unexceptionable, or perfectly distinct. We trust, therefore, that this court will hereafter be spared the necessity of examining the general bearing of such charges. It will in the present case be our duty, hereafter, to consider whether the objections raised against the present charge can be supported in point of law.

The original plaintiff claimed title at the trial under a marriage settlement, purporting to be made and executed on the 13th of January 1758, by an indenture of release, between Mary Philipse of the first part, Roger Morris of the second part, and Joanna Philipse and Beverly Robinson of the third part; whereby, in consideration of a marriage intended to be solemnized between Roger Morris and Mary Philipse, &c. &c. she, Mary Philipse, granted, released, &c. unto Joanna Philipse and Beverly Robinson, " in their actual possession now being, by virtue of a bargain and sale to them thereof made for one whole year, by indenture bearing date the day next before the date of these presents, and by force of the statute for transferring uses into possession, and to their heirs, all those several lots or parcels of land, &c. &c." upon certain trusts and uses in the same indenture mentioned. This indenture, signed and sealed by the parties, with the usual attestation of the subscribing witnesses, (William Livingston and Sarah Williams), to the sealing and delivery thereof, with a certificate of the proof of the due execution thereof by William Livingston (one of the subscribing witnesses), before Judge Hobart, of the supreme court of New York, on the 5th of April 1787, and

---

* (*a*) See Evans *vs.* Eaton, 7 Wheat. Rep. 356, 426.

a certificate of the recording thereof in the secretary's office of the state of New York, was offered in evidence at the trial by the plaintiff, and was objected to by the defendant, upon the ground that the certificate of the execution was not legal and competent evidence, and did not entitle the plaintiff to read the deed in evidence, without proof of its execution. The judge, who presided at the trial, overruled the objection, and admitted the deed in evidence. This constitutes the first exception of the defendant. A witness was then sworn, who testified that the signatures of William Livingston and Sarah Williams to the deed were in their proper hand writing, and that they were both dead. The deed was then read in evidence. The certificate of the probate of the deed before Judge Hobart, is in the usual form practised in that state, excepting only that it states with somewhat more particularity than is usual, that William Livingston, one of the subscribing witnesses, &c. being duly sworn, did testify and declare, " that he was present at or about the day of the date of the said indenture, and did see the within named Joanna Philipse, Beverly Robinson, Roger Morris and Mary Philipse, sign and seal the same indenture, *and deliver it as their and each of their voluntary acts and deeds,*" &c.

We are of opinion, that under these circumstances, and according to the laws of New York, there was sufficient prima facie evidence of the due execution of the indenture (by which we mean not merely the signing and sealing, but the delivery also), to justify the court in admitting it to be read to the jury ; and that in the absence of all controlling evidence, the jury would have been bound to find that it was duly executed. We understand such to be the uniform construction of the laws of New York, in all cases where the execution of any deed has been so proved, and has been subsequently recorded. The oath of a subscribing witness before the proper magistrate, and the subsequent registration, are deemed sufficient, prima facie, to establish its delivery as a deed. The objection was not, indeed, seriously pressed at the argument.

The next exceptions of the defendant grew out of the

non-production of the lease recited in the deed of marriage settlement, and of the insufficiency of the evidence to establish either its original existence, or its subsequent loss. We do not think it necessary to go into a particular examination of the various exceptions on this head, or of the actual posture under which they were presented to the court, or of the manner in which they were ruled by the court. Whichever way many of the points may be decided, our opinion proceeds upon a ground which supersedes them, and destroys all their influence upon the cause. We are of opinion, not only that the recital of the lease in the deed of marriage settlement was evidence between these parties of the original existence of the lease, but that it was conclusive evidence between these parties of that original existence ; and superseded the necessity of introducing any other evidence to establish it.

The reasons upon which this opinion is founded will now be briefly expounded. To what extent, and between what parties, the recital of a lease in a deed of release, (for we need not go into the consideration of recitals generally,) is evidence, is a matter not laid down with much accuracy or precision in some of the elementary treatises on the subject of evidence. It is laid down generally, that a recital of one deed in another binds the parties and those who claim under them. Technically speaking, it operates as an estoppel, and binds parties and privies ; privies in blood, privies in estate, and privies in law. But it does not bind mere strangers, or those who claim by title paramount the deed. It does not bind persons claiming by an adverse title, or persons claiming from the parties by title anterior to the date of the reciting deed.

Such is the general rule. But there are cases, in which such a recital may be used as evidence even against strangers. If for instance there be the recital of a lease in a deed of release, and in a suit against a stranger the title under the release comes in question, there the recital of the lease in such release is not *per se* evidence of the existence of the lease. But, if the existence and loss of the lease be established by other evidence, there the recital is admissible as secondary

proof in the absence of more perfect evidence, to establish the contents of the lease ; and if the transaction be an ancient one, and the possession has been long held under such release, and is not otherwise to be accounted for, there the recital will of itself under such circumstances materially fortify the presumption from lapse of time and length of possession of the original existence of the lease. Leases, like other deeds and grants, may be presumed from long possession, which cannot otherwise be explained ; and under such circumstances, a recital of the fact of such a lease in an old deed is certainly far stronger presumptive proof in favour of such possession under title, than the naked presumption arising from a mere unexplained possession.

Such is the general result of the doctrine to be found in the best elementary writers on the subject of evidence(a). Peake on Evidence (p. 165) seems, indeed, to have entertained a different opinion ; and to have thought, even as between the parties, the recital was admissible as secondary evidence only, upon proof that the lease was lost. But in this opinion he is not supported by any modern authority ; and it is very questionable if he has not been misled by confounding the different operations of recitals as evidence between strangers and between parties. It may not, however, be unimportant to examine a few of the authorities in support of the doctrine on which we rely. The cases of Marchioness of Anandale vs. Harris, 2 P. Wms, 432, and Shelley vs. Wright, Willes's Rep. 9, are sufficiently direct as to the operation of recitals by way of estoppel between the parties. In Ford vs. Gray, 1 Salk. 285, one of the points ruled was, "that a recital of a lease in a deed of release is good evidence of such lease against the releasor and those who claim under him ; but as to others it is not, without proving that there was such a deed, and it was lost and destroyed." The same case is reported in 6 Mod. 44, where it is said that it was ruled, "that

(a) See 1 Phillips on Evid. ch. 8, sec. 2, p. 411.  1 Stark. Evid. part 2, sec. 123, page 301, sec. 156, page 369.   Com. Dig. Estoppel B. C. Evidence B. 5.   Matthews on Presumpt. 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 269.  Co. Litt. 352.  Mayor, &c. of Carlisle vs. Blamire, 8 East's Rep. 487.

the recital of a lease in a deed of release is good evidence against the releasor, and those that claim under him." It is then stated that " a fine was produced, but no deed declaring the uses, but a deed was offered in evidence, which did recite a deed of limitation of the uses, and the question was whether that (recital) was evidence : and the court said that the bare recital was not evidence ; but that if it could be proved that such a deed had been, and lost, it would do, if it were recited in another." This was doubtless the same point asserted in the latter clause of the report in Salkeld ; and, thus explained, it is perfectly consistent with the statement in Salkeld, and must be referred to a case where the recital was offered as evidence against a stranger. In any other point of view, it would be inconsistent with the preceding propositions, as well as with the cases in 2 P. Williams and Willes. In Trevivan *vs.* Lawrence, 1 Salk. 276, the court held that the parties and all claiming under them were estopped from asserting that a judgment sued against the party as of trinity term, was not of that term, but of another term ; that very point having arisen and been decided against the party upon a scire facias on the judgment. But the court there held, (what is very material to the present purpose) that " if a man makes a lease by indenture of D. in which he hath nothing, and afterwards purchases D. in fee, and afterwards bargains and sells it to A. and his heirs, A. shall be bound by this estoppel ; and, that where an estoppel *works on the interest of the lands,* it runs with the land into whose hands soever the lands comes ; and an ejectment is maintainable upon the mere estoppel." This decision is important in several respects. In the first place it shows that an estoppel may arise by implication from a grant, that the party hath an estate in the land, which he may convey, and he shall be estopped to deny it(*a*). In the next place it shows that such estoppel binds all persons claiming the same land, not only under the same deed, but under any subsequent conveyance from the same party ; that

(*a*) See also Fairtitle *vs.* Gilbert, 2 T. Rep. 171. Helps et al. *vs.* Hereford, 2 B. & Ald. 242. Rees *vs.* Lloyd, Wightwick's Rep. 123.

is to say, it binds not merely privies in blood, but privies
in estate, as subsequent grantees and alienees. In the next
place it shows that an estoppel, which (as the phrase is)
works on the interest of the land, runs with it into whose
ever hands the land comes. Now, this last consideration comes
emphatically home to the present case. The recital of the
lease in the present release, works on the interest in the land;
the lease gave an interest in the land, and the admission of
it in the release enabled the latter to operate in the manner
which the parties intended. The estoppel, therefore, worked
on the interest in the land, not by implication merely, but
directly by the admission of the parties. That admission
was a muniment of the title, and as an estoppel travelled
with the title into whose ever hands it might afterwards
come. The same doctrine is recognized by lord chief baron
Comyn in his Digest, Estoppel B. & E. 10. In the latter
place (E. 10) he puts the case more strongly; for he asserts
that the estoppel binds, even though all the facts are found
in a special verdict. " But," says he (and he relies on his
own authority), " where an estoppel binds the estate, and
converts it to an interest, the court will adjudge accord-
ingly. As if A. leaves lands to B. for six years, in which he
has nothing, and then purchases a lease of the same land for
twenty-one years, and afterwards leases to C. for ten years,
and all this is found by verdict; the court will adjudge the
lease to B. good, though it be so only by conclusion. A
doctrine similar in principle was asserted in this court in
Terrett *vs.* Taylor, 9 Cranch, 52. The distinction then,
which was urged at the bar, that an estoppel of this sort
binds those claiming under the same deed, but not those
claiming by a subsequent deed under the same party, is not
well founded. All privies in estate by subsequent deed are
bound in the same manner as privies in blood; and so in-
deed is the doctrine in Comyn's Digest, Estoppel B. and in
Coke Litt. 352, a.

We may now pass to a short review of some of the Ame-
rican cases on this subject. Denn *vs.* Cornell, 3 Johns. Cas.
174, is strongly in point. There, lieutenant governor Col-
den, in 1775, made his will, and in it recited that he had

[Carver vs. Jackson ex dem. Astor et al.]

conveyed to his son David his lands in the township of Flushing, and he then devised his other estate to his sons and daughters, &c. &c. Afterwards, David's estate was confiscated under the act of attainder, and the defendant in ejectment claimed under that confiscation, and deduced his title from the state. No deed of the Flushing estate (the land in controversy) was proved from the father; and the heir at law sought to recover on that ground. But the court held, that the recital in the will, that the testator had conveyed the estate to David, was an estoppel of the heir to deny that fact, and bound the estate. In this case the estoppel was set up by the tenant claiming under the state, as an estoppel running with the land. If the state or its grantee might set up the estoppel, in favour of their title; then, as estoppels are reciprocal, and bind both parties, it might have been set up against the state or its grantee. It has been said at the bar, that the state is not bound by estoppel by any recital in a deed. That may be so, where the recital is in its own grants or patents, for they are deemed to be made upon suggestion of the grantee(a). But where the state claims title under the deed, or other solemn acts of third persons, it takes it cum onere, and subject to all the estoppels running with the title and estate, in the same way as other privies in estate.

In Penrose vs. Griffith, 4 Binn. Rep. 231, it was held that recitals in a patent of the commonwealth were evidence against it, but not against persons claiming by title paramount from the commonwealth. The court there said that the rule of law is, that a deed containing a recital of another deed, is evidence of the recited deed against the grantor, and all persons claiming by title derived from him, subsequently. The reason of the rule is, that the recital amounts to the confession of the party; and that confession is evidence against himself, and those who stand in his place. But such confession can be no evidence against strangers. The same doctrine was acted upon and confirmed by the same court, in Garwood vs. Dennis, 4 Binn. Rep. 314. In

(a) But see Comm. vs. Pejepscot Proprietors, 10 Mass. Rep. 155.

that case the court further held, that a recital in another deed was evidence against strangers, where the deed was ancient, and the possession was consistent with the deed. That case also had the peculiarity belonging to the present, that the possession was of a middle nature, that is, it might not have been held solely *in consequence* of the deed, for the party had another title ; but there never was any possession against it. There was a double title, and the question was, to which the possession might be attributable. The court thought that a suitable foundation of the original existence and loss of the recited deed being laid in the evidence, the recital in the deed was good corroborative evidence even against strangers. And other authorities certainly warrant this decision(*a*).

We think, then, that upon authority, the recital of the lease in the deed of release in the present case was conclusive evidence upon all persons claiming under the parties in privity of estate ; as the present defendant in ejectment did claim : and, independently of authority, we should have arrived at the same result upon principle ; for the recital constitutes a part of the title, and establishes a possession under the lease necessary to give the release its intended operation. It works upon the interest in the land, and creates an estoppel, which runs with the land against all persons, in privity, under the releasors. It is as much a muniment of the title, as any covenant therein running with the land.

This view of the matter dispenses with the necessity of examining all the other exceptions as to the nature and sufficiency of the proof of the original existence and loss of the lease, and of the secondary evidence to supply its place.

The next question is, supposing the marriage settlement duly executed, what estate passed by it to Morris and his wife, and their children. The uses declared in the deed are in

(*a*) See, in addition to the foregoing authorities, Buller's N. P. 254. Gilb. Evid. 100, 101. Bean *vs.* Parker, 17 Mass. Rep. 591. Wilkinson *vs.* Scott, 17 Mass. Rep. 244. Inhab. Braintree *vs.* Inhab. Hingham, 17 Mass. Rep. 432. Kite's Heirs *vs.* Shrader, 3 Litt. Rep. 447. 2 Thomas's Co. Litt. 582, note.

the following terms: "to and for the use and behoof of them, the said Joanna Philipse and Beverly Robinson, (the releasees,) and their heirs, until the solemnization of the said intended marriage; and from and immediately after the solemnization of the said intended marriage, then to the use and behoof of the said Mary Philipse and Roger Morris, and the survivor of them, for and during the term of their natural lives, without impeachment of waste; and from and after the determination of that estate, *then to the use and behoof of such child or children as shall or may be procreated between them, and to his, her or their heirs and assigns* forever. But in case the said Roger Morris and Mary Philipse shall have no child or children begotten between them, or that such child or children shall happen to die during the life time of the said Roger and Mary, and the said Mary should survive the said Roger, *without issue,* then to the use and behoof of her the said Mary Philipse, and her heirs and assigns forever. And in case the said Roger should survive the said Mary Philipse, *without any issue by her, or that such issue is then dead without leaving issue,* then, after the decease of the said Roger Morris, to the only use and behoof of such person or persons, and in such manner and form, as the said Mary Philipse shall at any time during the said intended marriage, devise the same by her last will and testament," &c. &c. There are other clauses not material to be mentioned.

The marriage took effect; children were born, and indeed all the children were born before the attainder in 1779. Mary Morris survived her husband, and died in 1825, leaving her children, the lessors of the plaintiff, surviving her. The conveyance taking effect by the statute of uses, upon a deed operating by way of transmutation of possession; no difficulty arises in giving full effect, by way of springing or shifting or executory uses, to all the limitations, in whatever manner they may be construed. The counsel for the original defendant contend, that the parents take a life estate, and that there is a remainder upon a contingency, with a double aspect. That the remainder to the children is upon the contingency of their surviving their parents; and in case of their non-

survivorship, there is an alternative remainder to the mother, which would take effect in lieu of the other. That, consequently, the remainder to the children was a contingent remainder during the life of their parents; and as such it was destroyed by the proceedings and sale under the act of attainder and banishment of 1779. The circuit court was of a different opinion; and held, that the remainder to the children was contingent until the birth of a child, and then vested in such child, and opened to let in after born children; and that there being a vested remainder in the children at the time of the act of 1779, it stands unaffected by that act.

We are all of opinion that the opinion of the circuit court upon the construction of the settlement deed was correct. It is the natural interpretation of the words of the limitations, in the order in which they stand in the declaration of the uses. The estate is declared to be to the parents during their natural lives, and then to the use and behoof of such child or children as may be procreated between them, and to his, her, and their heirs and assigns for ever. If we stop here, there cannot be a possible doubt of the meaning of the provision. There is a clear remainder in fee to the children, which ceased to be contingent upon the birth of the first, and opened to let in the after born children(a). It is perfectly consistent with this limitation that the estate in fee might be defeasible, and determinable upon a subsequent contingency; and upon the happening of such contingency, might pass by way of shifting executory use, (as it might in case of a devise by way of executory devise,) to other persons in fee; thus mounting a fee upon a fee. The existence then of such executory limitation over, by way of use, would not change the nature of the preceding limitation, and make it contingent, any more than it would in the case of an executory devise. The contingency would attach, not to the preceding limitation, but to the executory use over.

Let us now consider what is the effect of the succeeding

(a) See Doe vs. Perryn, 3 T. R. 484. Doe vs. Martin, 7 T. R. 83. Bromfield vs. Crowder, N. R. 313. Doe vs. Provoost, 4 Johns. Rep. 61.

clause in the settlement deed, and see if it be capable, consistently with the apparent intention of the parties, of operating as an alternative remainder under the double aspect of the contingency, as contended for by the original defendant. The clause is, " but in case the said Roger Morris and Mary shall have no such child or children begotten between them, or that such child or children shall happen to die during the life time of the said Roger and Mary, and the said Mary should survive the said Roger, without issue, then, &c." Now, it is important to observe that this clause does not attach any contingency to the preceding limitation to the children, but merely states the contingency upon which the estate over is to depend. It does not state that the children shall not take, unless they *survive* the parents; but that the mother shall take in case she survives her husband, *without issue*. She then, and not the children, is to take in case of the contingency of her survivorship. It is applied to her, and not to them. Besides, upon the construction contended for at the bar, if all the children should die during the life time of the parents, *leaving any issue*, such issue could not take; and yet a primary intention was to provide for the issue of the marriage. Nor in such a case could the mother take the estate over; for that by the terms of the settlement could take effect only in case she survived her husband *without issue.* The subsequent clause demonstrates this still more fully; for her power to dispose of the estate by will, in case her husband survives her, is confined to such survivorship, if " such issue is then dead without leaving issue."

　　Another difficulty in the construction contended for is, that the children must survive both the parents, and that if they should survive the mother and not the father, in that event they could not take; yet the settlement plainly looks to the event of the death of the mother without issue, as that alone in which the estate over is to have effect. It is also the manifest intention of the settlement, that if there is any issue, or the issue of any issue, such issue shall take the estate; which can only be by construing the prior limitation in the manner in which it is construed by this court. The general rule of law, founded on public policy, is, that limitations of this

nature shall be construed to be vested, when, and as soon as they may. The present limitation, in its terms, purports to be contingent only until the birth of a child, and may then vest. So that whether we consult the language of the settlement, the order of its provisions, the apparent intention of the parties, or the general rule of law, they all lead to the same results; that the estate to the children was contingent only until their birth; and that when the act of 1779 passed, they being all then born, it was a vested remainder in them and their heirs, and not liable to be defeated by any transfer or destruction of the life estate.

This view of the settlement deed renders it wholly unnecessary to enter upon any minute consideration of the nature and operation of the attainder act of 1779; since it is clear that that act, whether it worked a transfer or destruction of the life estate of the parents; and, in our opinion the former was its true operation; it did not displace the vested remainder of the children, but left it to take effect upon the regular determination of the life estate.

In respect to another point raised at the argument, that the power reserved to Roger Morris and his wife under the marriage settlement, to dispose of the land to the amount of three thousand pounds, so far as it remained unexecuted by them, was by the attainder act of 1779 transferred to the state, and might be executed by the state; we are of opinion, that it is not well founded. In the first place, we consider this to be a power, personal in the parents, and to be exercised in their discretion, and not in its own nature transferable. Even under the statutes of treason in England, powers and conditions, personal to the parties, did not by an attainder pass to the crown. 1 Hale's Pl. Cr. 240, 242, 244, 245, 246. Jackson vs. Catlin, 2 Johns. Rep. 248. Sugden on Powers, 174, 176. And it has been settled in New York, that the offence stated in the act, was not, strictly speaking, treason, but, sui generis as the terms of the act stated it(a). In the next place, the act purports to vest in the state, by forfeiture, the " estates" only of the offenders; and being a

(a) Jackson vs. Catlin, 2 Johns. Rep. 248,

penal act, it is to be construed strictly. A *power* to dispose of land in the seisin of a third person, is in no just sense an *estate* in the land itself. In the next place the deed of the commissioners authorised by the act, purports generally to convey all the estate, right, title, and interest of the offenders in the property conveyed, and does not purport to be any execution of a limited nature and object. In every view, the doctrine contended for is untenable.

Passing over, for the present, some minor exceptions, we may now advance to the consideration of the objections urged against the charge of the court ; and these objections, so far as they have not been already disposed of by the questions growing out of the proofs applicable to the lease, are to the direction of the court upon the point, whether there was or was not a due delivery of the marriage settlement deed. If that deed was duly delivered, then no acts done after the marriage by the parents, however inconsistent with that deed, could affect the legal validity of the rights of the children, once acquired and vested in them under it. But the point pressed at the trial was, whether it was ever executed and delivered at all, so as to have become an operative conveyance ; or whether there was a mere nominal execution by the parties; and whether it was laid aside and abandoned as a conveyance before the marriage, and never became complete by delivery. There was at the trial what the law deems sufficient prima facie evidence of the delivery of the deed. But certain omissions, as well as certain acts of the parents were relied on to rebut this evidence, and to establish the conclusion, that there had been, in point of fact, no such delivery. With the value of these acts and circumstances, as matters of presumption for the consideration of the jury by way of rebutter of the prima facie evidence, this court has nothing to do ; and does not intend to express any opinion thereon. But so far as they bore upon the fact of delivery, they applied with the same force in relation to the children as they did in relation to the parents; that is, so far as they were presumptive of the non-delivery of the deed, they furnished the same presumption against the children that they would against the parents. They were open to explanation and observation, and had just as much weight in

the one case as in the other. They were not acts or omis-
sions which bound the children, supposing them to have
any vested interest ; but circumstances of presumption to
be weighed, as far as they went, to establish that no interest
ever vested in them, by reason of the non-delivery of the
deed of settlement. Whatever might be the inconsistency
of these acts with the provisions of that deed, that inconsist-
ency was no otherwise important than as it might furnish a
presumption against the existence of the deed as an opera-
tive conveyance.

It is in reference to these considerations that the argu-
ment at the bar has insisted upon objections to the charge
of the judge at the trial ; and in examining the charge on
this head, difficulties have occurred to the court itself.

The circumstances principally relied upon were, the dor-
mancy of the settlement deed from 1758 to 1779 ; the omis-
sion to record it until 1787 ; and the supposed inconsistency
of certain deeds, executed by the parents between 1758 and
1773, with the title under that settlement.

In respect to the dormancy of the deed, the charge is
as follows : " It has been said that this is a dormant deed,
never intended by the parties to operate; that it had slept
until after the attainder, and until the year 1787. *There is
weight* in this ; or rather there would be weight in it, *if the
parties in interest had slept on their rights.* But who has
slept ? Morris and wife, Beverly Robinson and Joanna
Philipse, the trustees. They are the persons that have slept,
and *not the children.* This does not justify so strong an in-
ference against the children, as if they had slept upon their
rights. Is it fair in such a case to draw any inference *against
the children* ?"

To two of the judges this appears to amount to a direc-
tion that in point of law the dormancy of the deed during
this period, not having been the act of the children, does
not furnish the same presumption of the non-delivery against
them as it would against the parents ; and that, to give the
presumption from this circumstance full effect, it ought to
appear that the children had slept on their rights ; that is,
had acquiesced in such dormancy of the title. To those

judges this direction seems erroneous, because the presumption is the same whether the children acquiesced or not.

In respect of the non-recording of the deed, the charge proceeds to state.   " It has also been urged that this deed was not recorded until 1787.   Is there any thing in this fact *that should operate against the children?*   They were minors for the greater part of the time down to the year 1787, when it was recorded, &c. &c." It seems to the same judges, that the same distinction, as to the effect of the presumption in the case of the parents and that of the children, pervades this, as it does the former statement.

As to the inconsistency relied on, the introductory part of the charge is as follows :   " It is also said that Morris and his wife have done acts inconsistent with the deed.   In weighing the force and effect of these acts, you must bear in mind the time *when the interest vested in the children under this deed;* for after that interest vested, none but themselves could divest it," &c.   It is certainly true, that after the interest was once vested in the children, no act, however inconsistent with the deed, done by the parents could affect that interest   But the point of view under which the argument was addressed to the court was, that such inconsistency furnished ground for a presumption of a non-delivery of the deed ; and in this point of view it seems to the same judges, that this part of the charge relies too much upon a distinction between the parents and children, as to the effect of the presumption.   In another part of the charge, the judge very properly puts all these acts of supposed inconsistency upon the true ground: what was the interest of the parties in these acts ; and whether they were done in hostility to the deed, supposing it inoperative, or as acts of parents acting beyond the deed for what they might deem beneficial to their children, and for the interest of all concerned in the estate.

To the other judges, however, these objections do not appear to be well founded, when taken in connection with the general scope and object of the remarks of the judge in his charge upon this branch of the case.   The purpose for which these omissions and acts of alleged inconsistency in Morris were offered, had been explicitly stated.   The jury had been

told that they were relied upon to rebut the evidence of delivery of the deed, which had been offered on the part of the plaintiff below. Before entering upon any comments on this evidence, and to prepare the minds of the jury for the due application of the remarks, the judge observed, " what then is the evidence to bring the *fact of delivery* into doubt. What is the reasonable presumption to be drawn from the facts proved? keeping in mind that this is evidence on the part of the defendant to disprove the presumption of law, from the facts proved, that the deed was duly delivered. The jury were therefore fully apprised of the bearing of these circumstances, and the purpose for which they were offered. And they could not but have understood that it was submitted to them to judge of the weight to which they were entitled ; otherwise the evidence would have been excluded as inconsistent : and the jury must have understood, that they did weigh to some extent against the children ; for when speaking of the objection, that the deed had lain dormant for a number of years, the jury were told, that this circumstance did not justify *so strong* an inference against the children as if they had slept upon their rights ; thereby admitting, that it was open to an inference against them, but not so strong as if they had been of age, and the life estate of their parents ended; and they during that delay had been in a situation to assert their rights. And should it be admitted that the judge erred in this suggestion, it would amount to no more than an intimation of his opinion upon the weight of evidence. The same remark will apply to every part of the charge, when the rights of the children are spoken of in contradistinction to those of their parents. They refer to the *delivery* of the deed. Thus with respect to the delay in recording the deed; the judge puts the question to the jury in this form. " Is there any thing in the fact that it was not recorded, from which an inference can be drawn against the *deed*." Pointing the attention of the jury to the fact of *delivery*, and not to any controlling distinction between the interest of the children and their parents, the bearing of the remarks of the judge with respect to the various deeds executed by Morris and his wife,

and which are alleged to have been inconsistent with the marriage settlement, could not have misled the jury. It is true, they were told that in weighing the force and effect of those acts, they must bear in mind the time when the interest vested in the children under the deed. This remark must have been understood by the jury as subject to their finding with respect to the delivery of the deed; and not as expressing an opinion that the interest of the children vested at the date of the deed. For, if that had been understood as the opinion of the judge, the evidence, as before observed, would have been inadmissible, and the jury would have been told that it could have no bearing upon the case. Instead of which, it had been before explained to them, that the object of this evidence was to disprove the delivery of the marriage settlement deed, and not to divest any interest, that had become vested in the children. And in the conclusion of this part of the charge, the judge tells the jury, "these are all the circumstances relied upon as being inconsistent with the settlement deed, and these are questions for you. I do not wish to interfere with your duties. It is for you to say whether the deed was duly executed and *delivered*."

The jury had been told, in a previous part of the charge, that delivery of the deed was essential in order to pass the title, and that this was a fact for them to decide; and it was in conclusion left to them, in as broad a manner as could be done. The whole scope of the charge on this point, left the evidence open for the full consideration of the jury, and the remarks of the judge are no more than a mere comment on the weight of evidence, and as such were addressed to the judgment of the jury, and not binding upon them. If a decided opinion had been expressed by the judge upon the weight of the evidence, it is not pretended that it would be matter of error, to be corrected here. But the charge does not even go thus far; and it is believed by a majority of the court, that it is not justly exposed to the criticisms which have been applied to it.

In respect to that part of the charge which comments upon the various deeds made by the parents, which were

relied upon as inconsistent with the settlement deed; no objection has occurred to any member of the court, except as to the comments on the deeds to Hill and Merritt, and the life leases to other persons. In respect to the deeds to Hill and Merritt, one judge is of opinion that the statement, " that these deeds are not inconsistent with the settlement deed," is incorrect in point of law, because those deeds contained a covenant of seisin ; and under the settlement deed, although Morris and wife had a right to convey the land, they were not in the actual seisin of it, and therefore such a covenant was inconsistent with the settlement deed.   But the other judges are of opinion, that this part of the charge is correct, because Morris and wife had, under the settlement deed, a power to convey in fee lands to a much greater amount; that it was not necessary to recite in their deeds of sale their power to sell ; and that the covenant of seisin, being a usual muniment of title, and not changing in the slightest degree the perfection of the title actually conveyed; did not, in point of law, whether there was a seisin or not, create any repugnancy between these deeds and the settlement deed.   If the parties had in those deeds recited the settlement deed and the power to convey, and had then conveyed with the same covenants, the deeds could not have been deemed, in point of law, inconsistent with the power under the settlement deed ; but would have been deemed a good execution of the power, and the covenants a mere additional security for the title.   The same judge is also of opinion, that the life leases which were given in evidence, not having been made in pursuance of the power in the marriage settlement deed, are by their terms and effect so inconsistent with it, as to authorise the jury to find against its delivery on this ground alone; and that the circuit court erred in charging the jury, that the effect and operation of these leases was not a subject for their inquiry, and that their bearing on the cause depended on the intention of Morris.

To the other judges, however, the charge in this particular is deemed unexceptionable.   The judge decided that these life leases were unauthorised by the power : and the

question was, what influence they ought to have upon the point of non-delivery of the settlement deed; they not deriving any validity or force under it.   Were they acts of ownership over the property which could not be explained consistently with the existence of the settlement deed; or were they acts which, though unauthorised, might fairly be presumed to be done without any intention to disclaim the legal title under that deed?   In estimating this presumption, it is to be considered that these were the acts of parents, and not of strangers.   That it does not necessarily follow, because parents do unauthorised acts in relation to the estates of their children, they intend those acts as hostile or adverse to the rights of their children.   Parents may, from a sincere desire to promote the interest of their children, and to increase the value of their estates, make leases for the clearing and cultivation of their estates, which they know to be unauthorised by law, but which, at the same time, they feel an entire confidence will be confirmed by their children. The very relation in which parents stand to their children, excuses, if it does not justify such acts.   It will be rare, indeed, if parents may not confidently trust that their acts, done bona fide for the benefit of their children, will, from affection, from interest, from filial reverence, or from a respect to public opinion, be confirmed by them.   The acts of parents therefore, exceeding their legal authority, admit of a very different interpretation from those of mere strangers.   The question in all such cases is, what were the intentions and objects of the parents?   Did they act upon rights which they deemed exclusively vested in themselves? or did they act with a reference to the known interests vested in their children?   It appears to the majority of the judges, that the circumstance of the life leases was properly put to the jury as a question of intention; and that the jury were left at full liberty to deduce the proper conclusion from it.

The next point is, as to the improvements claimed by the tenant in ejectment under the act of New York of the 1st of May 1786.   That act declares, "that in all cases of purchases made of any forfeited estates in pursuance of any of the laws directing the sale of forfeited estates, in which any

purchaser of such estates shall be evicted by due course of law, in the manner mentioned, &c. &c. such purchaser shall have like remedy for obtaining a compensation for the value of the improvements by him or her made on such estate, so by him or her purchased, and from which he or she shall be so evicted, as is directed in and by the first clause in the" act of the 12th of May 1784. The latter act declares that the person or persons having obtained judgment, shall not have any writ of possession, nor obtain possession of such lands, &c. until he, she or they shall have paid to the person or persons possessing title thereto, derived from or under the people of the state, the value of all improvements made thereon after the passing of the act. Neither the act of 1784 nor of 1786, purports to give a universal remedy for improvements in cases of eviction by title paramount; but is confined to cases of confiscated estates, where the title comes by sale from the state. However operative it may be as to citizens of the state, (on which it is unnecessary to give any opinion), the question before us is, whether such improvements can be claimed in this case consistently with the treaty of peace of 1783.

By the fifth article of that treaty, it is agreed, " that all persons who have any interest in confiscated lands, either by debts, marriage settlements, or otherwise, shall meet with no lawful impediment in the prosecution of their just rights." By the sixth article it is agreed, that, " there shall be no future confiscations made, nor any prosecutions commenced against any person or persons for or by reason of the part which he or they may have taken in the war; and that no person shall on that account suffer any future loss or damage, either in his person, liberty, or property." We think, that the true effect of these provisions is to guaranty to the party all the rights and interests which he then had in confiscated and other lands, in the full force and vigour which they then possessed. He was to meet with no impediment to the assertion of his just rights; and no future confiscations were to be made of his interest in any land. His just rights were at that time to have the estate, whenever it should fall into possession, free of all incumbrances or

liens for improvements created by the tenants for life, or by purchasers under the state. To deny him possession, or a writ of possession, until he should pay for all such improvements, was an impediment to his just rights, and a confiscation, pro tanto, of his estate in the lands. The argument at the bar supposes that there is a natural equity to receive payment for all improvements made upon land. In certain cases there may be an equitable claim; but that in all cases a party is bound by natural justice to pay for improvements made against his will, or without his consent, is a proposition which we are not prepared to admit. We adhere to the doctrine laid down on this subject in Green *vs.* Biddle, 8 Wheat. 1.

We are of opinion that the claim for improvements in this case, is inconsistent with the treaty of peace, and ought to be rejected.

A number of objections, of a minor nature, are spread upon the record; such as exceptions to the admission of evidence to prove the common practice to convey lands by way of lease and release, and the admission of the journals of the legislature; to the admission of the act of compromise between the state and John Jacob Astor; to the sufficiency of the title of Astor under the deed of the children of Morris and wife, to extinguish their title, &c. &c. To all these, we think it unnecessary to make any farther answer, than that they have not escaped the attention of the court; and that the court perceive no valid objection to the ruling of the circuit court respecting them.

Upon the whole, it is the opinion of this court, that the judgment of the circuit court be, and the same is hereby affirmed with costs.